# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-11267

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

MARRICO EDWARD SPEARS,

Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**

January 21, 2016

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:14-CR-82-1

Before BENAVIDES, DENNIS, and COSTA, Circuit Judges.

FORTUNATO P. BENAVIDES, Circuit Judge:*

Defendant-Appellant Marrico Edward Spears ("Spears") appeals his jury trial conviction and sentence for drug and firearm offenses. Law enforcement officers stopped Spears as he was driving from a house under surveillance for drug activity and, after detaining him for almost forty minutes while attempting to obtain a drug-sniffing dog, searched his vehicle. Spears appeals, inter alia, the district court's denial of his motion to exclude evidence obtained

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-11267

as a result of the search and seizure, contending the search and seizure violated the Fourth Amendment. For the reasons below, we REVERSE the district court's denial of Spears's motion to exclude evidence, and we VACATE his conviction and sentence.

## I. BACKGROUND

### A.     The Drug Investigation

On the day of the search and seizure, Spears visited a house located on New York Avenue in Fort Worth, Texas (the "New York House") that law enforcement officers were monitoring for drug activity. Horacio Loera ("Loera"), a suspected drug dealer, lived at the New York House. An officer testified that a drug investigation into Loera began in February 2013, when officers "seized approximately 250 pounds of marijuana from a business" owned by Loera. Through investigation, officers identified multiple people suspected to be Loera's customers. Once in May 2013 and once in October 2013, confidential informants purchased drugs from people associated with Loera. Also in May 2013, an undercover officer purchased drugs from a person who had very recently visited the New York House.

On January 15, 2014, law enforcement officers asked a confidential informant to order cocaine from a different suspected drug dealer. When the confidential informant placed the order, the suspected drug dealer said he would contact his source. The officers then began conducting surveillance on the suspected drug dealer. The officers observed the suspected drug dealer travel to the New York House and knock on the door, but nobody answered the door. He then told the confidential informant, "I'm not able to get the kilo [of cocaine]. I'm trying—I've tried to get a hold of my guy. I can't get a hold of him. I went by his house. I can't get anybody to answer." An officer testified that based on this, the officers concluded that the suspected drug dealer had tried to get cocaine from the New York House.

2

No. 14-11267

The following morning around 9:00 a.m., on January 16, 2014, officers set up surveillance at the New York House. An officer testified that the officers "decided instead of trying to set up the buy again that [they] would move up and go directly to the source of the cocaine." The officer also answered affirmatively when asked whether the officers "anticipate[d] that [the prior day's] transaction might actually be consummated" that day. The record does not contain any further explanation as to why the officers believed a drug transaction might occur that day specifically.

After approximately thirty minutes of surveillance, Loera arrived at the New York House driving a silver sport utility vehicle. Shortly thereafter, Spears arrived at the New York House driving a white truck with an Oklahoma license plate. A third, blue car either arrived near this same time or was already parked in the driveway when surveillance began. The driveway extended all the way down the side of the house, behind the house, and into the backyard. Spears backed his truck into the driveway towards the back of the house—in between the house and the fence—in a manner that completely obstructed the driver's side and the passenger's side of the truck from the view of the officers on the street. Had the officers been located directly in front of the driveway, they would have been able to see Spears's truck better, but from their vantage point they could not see whether Spears exited his truck, entered or exited the house, or talked to Loera. At this time, Spears was unknown to the officers, and he had not previously been identified as a suspect connected with drug activity, the New York House, or Loera.

Spears drove away from the New York House ten to twenty minutes after he arrived, and an officer followed him. Five to ten minutes after Spears left, a red car with Louisiana license plates arrived at the New York House. Officers observed two men get out of the red car, meet with Loera in the front yard, go to the back of the house without carrying anything, return to the car

3

No. 14-11267

carrying a duffle bag, and put the duffle bag in the trunk of the car. The two men left after approximately five minutes, and officers followed them. Shortly thereafter, Loera left in the sport utility vehicle, and officers followed him as well.

**B.     The Stop, Search, and Seizure**

An officer pulled Spears over after another officer witnessed him commit a traffic violation. As the officer approached Spears's truck, he observed Spears rummaging around the center console of the truck. The officer asked Spears for his identification and insurance, which he provided, and a few other questions. After speaking with Spears for approximately one minute, the officer returned to his patrol car. After approximately four and half minutes in the patrol car, the officer exited the patrol car and began speaking with Spears again. The officer testified that while he was questioning Spears, Spears appeared nervous, was not giving straight answers, was evasive in responding to questions, and was very non-compliant. When the officer asked Spears where he was coming from, Spears said he was coming from visiting a relative, which the officer believed was an untrue statement. When asked, Spears said he did not have any weapons in the truck, but he did not consent to a search of the truck. The officer then instructed Spears to step outside the truck in order to, in part, pat him down to ensure he did not have any weapons on him, but he refused. When a second officer arrived, they again asked Spears to step outside the truck. Again Spears initially refused, but he complied approximately one minute after being asked. After the pat down, the officers instructed Spears to sit in the back of the patrol car to wait for a drug-sniffing dog to arrive. He complied after protesting for approximately two minutes. When Spears first entered the back of the patrol car, approximately sixteen and a half minutes had elapsed since he was first pulled over.

4

No. 14-11267

At some point, officers with both the Fort Worth Police Department and the United States Drug Enforcement Administration (the "DEA"), which were both involved in the drug investigation, had begun trying get a drug-sniffing dog to the traffic stop. DEA officers in particular made multiple phone calls to different agencies, but no drug-sniffing dogs were available. An officer testified that one of the reasons they wanted to use a dog was to get probable cause to search Spears's vehicle. While still unable to locate a dog, the officers detaining Spears were informed by other officers that they had found a large, vacuum-sealed bag of money in Loera's sport utility vehicle after stopping Loera. Upon receiving this information, the officers collectively decided there was probable cause to search Spears's truck, and they proceeded to do so. Almost forty minutes had elapsed from the time Spears was initially stopped until the time the search began.

In their search, the officers found a semiautomatic handgun in the center console, a backpack that contained approximately $59,800 in cash, a counterfeit money detector, and a laundry bag that smelled of marijuana. Spears was arrested and transported to the DEA office. His cell phone was obtained from his person when he was processed at the DEA office. The government subsequently searched his cell phone and found a picture of marijuana and a picture of stacks of money with a vacuum sealer. An officer testified that while Spears was at the DEA office, he admitted purchasing marijuana from Loera in the past and giving Loera a cash down payment that morning for marijuana. Loera ultimately admitted the same information after his arrest when questioned at the DEA office.

## C.     Procedural History

The United States filed a complaint against Spears on March 20, 2014, and he was first indicted on April 16, 2014. The third superseding indictment charged Spears with three counts: conspiracy to possess with intent to

No. 14-11267

distribute at least 100 kilograms of marijuana, felon in possession of a firearm, and possession of a firearm in relation to a drug trafficking crime.

On May 16, 2014, Spears filed a motion to suppress all the evidence obtained as a result of the search and seizure, including the physical evidence obtained from his truck, the cell phone pictures, and his alleged admission. On May 30, 2014, the district court held a hearing on the motion to suppress evidence. During the hearing, the United States called three officers involved in the stop and search. Spears did not call any witnesses, but he introduced evidence that included the patrol car's video and audio recording of the stop. The district court denied the motion to suppress evidence, holding that law enforcement officers had probable cause to search Spears's vehicle and that Spears's detention pursuant to a traffic stop until there was probable cause for the search was reasonable.

Spears's trial commenced on June 16, 2014. After two days, the jury convicted Spears on all three counts. The district court sentenced Spears to a total term of imprisonment of 420 months and a 4-year term of supervised release. Spears now appeals, inter alia, the district court's denial of his motion to suppress evidence.

## II. STANDARD OF REVIEW

"When reviewing a district court's denial of a motion to suppress evidence as obtained in violation of the Fourth Amendment, we review the factual determinations for clear error and the legal conclusions de novo." *United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013). "[W]e may consider all of the evidence presented at trial, not just that presented" at the motion to suppress hearing. *United States v. Raney*, 633 F.3d 385, 389 (5th Cir. 2011) (alternation in original). "[W]e may affirm the district court's decision on any basis established by the record." *Powell*, 732 F.3d at 369.

6

No. 14-11267

## III. ANALYSIS

Spears contends the district court erred in denying his motion to suppress evidence because his detention pursuant to a vehicular stop and the subsequent warrantless search of his vehicle violated the Fourth Amendment. The United States contends the search and seizure did not violate the Fourth Amendment because law enforcement officers had reasonable suspicion of criminal activity sufficient to stop and detain Spears, which developed into probable cause to search his vehicle.

"The exclusionary rule allows a defendant to suppress the evidentiary fruits of a violation of his Fourth Amendment rights." *United States v. Pack*, 612 F.3d 341, 347 (5th Cir.), *modified on other grounds*, 622 F.3d 383 (5th Cir. 2010). "We analyze the legality of traffic stops for Fourth Amendment purposes under the standard articulated by the Supreme Court in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)." *Id.* at 349–50. The *Terry* standard involves a two-part inquiry. *Id.* at 350. "First, we determine whether stopping the vehicle was initially justified by reasonable suspicion." *Powell*, 732 F.3d at 369. Second, we determine "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place." *United States v. Macias*, 658 F.3d 509, 517 (5th Cir. 2011).

"Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the . . . seizure." *Id.* at 519–20 (omission in original). "Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Pack*, 612 F.3d at 352. The reasonable suspicion analysis "is necessarily fact-specific, and factors

7

which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion." *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999). "'We must pay heed to the Supreme Court's admonition not to treat each factor in isolation,' and instead must consider 'the totality of the circumstances and the collective knowledge and experience of the officer.'" *Macias*, 658 F.3d at 520 (citations omitted). Under the collective knowledge doctrine, reasonable suspicion "can vest through the collective knowledge of the officers involved in the search and seizure operation." *Powell*, 732 F.3d at 369.

## A.   Whether Stopping the Vehicle Was Initially Justified by Reasonable Suspicion

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez–Moreno,* 420 F.3d 420, 430 (5th Cir. 2005). Even if a traffic violation has not been committed, an officer may stop a vehicle for investigatory purposes if he or she has a reasonable suspicion of criminal activity. *United States v. Zavala*, 541 F.3d 562, 574 (5th Cir. 2008). The United States contends, and the district court found, that the law enforcement officers were initially justified in stopping Spears's vehicle for two reasons: reasonable suspicion of a traffic violation and reasonable suspicion of a drug crime. Each reason is addressed in turn.

First, law enforcement officers testified Spears committed a traffic violation. Specifically, the officer that pulled Spears over, who was with the Fort Worth Police Department, testified that an officer with the DEA communicated to him that he had observed Spears change lanes without signaling, which is a traffic violation. Additionally, an officer with the DEA testified that his colleague observed Spears commit a traffic violation. Based

No. 14-11267

on this evidence, we find stopping Spears's vehicle was initially justified by a reasonable suspicion that he had committed a traffic violation.

Second, the United States contends the traffic stop was initially justified because the officers had a reasonable suspicion that Spears had committed or was about to commit a drug crime.  The United States claims the following facts created this reasonable suspicion: Spears visited the New York House, which had been the site of an attempted drug transaction with a confidential informant the day before, was where a suspected drug dealer lived, and had previously been visited by a person very soon before that person sold drugs to an undercover officer; Spears backed his truck into the driveway in a manner that obstructed the driver's side and the passenger's side of the truck from the view of the officers; Spears had an out-of-state license plate; multiple vehicles arrived at the New York House near the time Spears arrived at the New York House; and Spears stayed at the New York House for only ten to twenty minutes.

Visiting a house linked to drug activity is similar to being in a high-crime area.  While a person's presence in an area known to be high in crime is a "'relevant contextual consideration'" in the reasonable suspicion analysis, such presence, "'standing alone, is not enough' to support a reasonable suspicion that anybody found there is involved with drugs." *United States v. Hill*, 752 F.3d 1029, 1035 (5th Cir. 2014) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)).  Likewise, the fact that Spears visited the New York House, which was linked to drug activity in several ways, is relevant; however, this fact alone is not enough to support a reasonable suspicion that he is involved with drugs. Significantly, neither Spears nor his truck were known to the officers before he visited the New York House, and he had not previously been identified as a suspect connected with drug activity, the New York House, or Loera.  Also, the officers did not observe Spears take any action besides parking in the driveway;

9

specifically, they did not see Spears exit his truck, enter or exit the New York House, or talk to Loera. Thus, the officers had no way of differentiating Spears from a law-abiding visitor—for example, a maintenance technician visiting to work on the house, or a relative visiting for social purposes only. For these reasons, additional suspicious activity is needed to give rise to a reasonable suspicion that Spears had committed or was about to commit a crime.

The United States claims that backing into the driveway in a manner that concealed loading and unloading of the truck was suspicious. However, backing into the driveway of a house is not unusual, and there is no indication that Spears backed his truck into the driveway in an atypical way. Although the way Spears parked obstructed the driver's side and the passenger's side of the truck from the view of the officers on the street, the officer's view was obstructed because of the placement of the back of the driveway in relation to the fence, the house, and the officer's location on the street—not because of anything Spears did other than park in the back of the driveway. Had the officers been located directly in front of the driveway, they would have been able to see Spears's truck better. Also, no evidence was adduced that Spears loaded or unloaded anything while at the New York House, nor was any evidence provided that the contents of Spears's truck changed while at the New York House. Just as we have found "the fact that a car is backed into a parking space [of an apartment complex] is of little persuasive value in evaluating reasonable suspicion," *Hill*, 752 F.3d at 1036, the fact that Spears backed into the driveway of the New York House is of little persuasive value here.

The United States also claims the fact that Spears was driving a truck with Oklahoma license plates in northern Texas was suspicious. An officer testified that out-of-state license plates are very common in narcotic investigations, especially when dealing with large quantities of drugs, because people do not usually come from out of state to buy a small quantity of drugs.

No. 14-11267

However, we have noted that "an out-of-state driver's license and license plates . . . may not suffice to create reasonable suspicion of criminal activity." *United States v. Davis*, _ F. App'x _ , 2015 WL 4931408, at \*3 (5th Cir. Aug. 19, 2015).  On one hand, we have found a reasonable suspicion of drug crime where, inter alia, a tractor-trailer with out-of-state license plates exited a main road to an area without a gas station or truck stop. *United States v. Chasten*, 223 F. App'x 418, 420 (5th Cir. 2007).  On the other hand, other circuits have found a vehicle with out-of-state license plates, even on a highway known to be used for drug trafficking or even when exiting a highway at an unlikely place for cross-country travelers, does not give rise to a reasonable suspicion of drug crime because if it did, "officers could pull over scores of drivers every day" and because "[t]oo many people fit this description for it to justify a reasonable suspicion of criminal activity."  *Huff v. Reichert*, 744 F.3d 999, 1004–05 (7th Cir. 2014); *United States v. $45,000.00 in U.S. Currency*, 749 F.3d 709, 723 (8th Cir. 2014); *United States v. Yousif*, 308 F.3d 820, 828 (8th Cir. 2002) (alternation in original).  Here, unlike in our *Davis* case, there is no evidence or suggestion that Spears was travelling in an area of northern Texas unfrequented by Oklahoma visitors in pickup trucks.  While we view the facts in light of the officer's experience, the same officer who testified about the commonality of out-of-state license plates in narcotics investigations also testified that is it is "not uncommon to see out-of-state plates go to a house." Even assuming travelling with an out-of-state license plate can be a factor supporting reasonable suspicion, we find Spears's travel with an out-of-state license plate in this case does not give rise to a reasonable suspicion of criminal activity.

Lastly, the United States claims the fact that multiple vehicles arrived at the New York House near the same time and the fact that Spears stayed at the New York House for only ten to twenty minutes were suspicious.  However,

the officer that testified about this issue did not necessarily say that such facts were suspicious; rather, he said the multiple arrivals "piqued [the officers'] interest," especially given that there was not any activity at the New York House during the first thirty minutes of surveillance, "showed [them] that there was some definite activity going on," and made it "appear[ ] to [them] that everyone seemed to arrive at approximately the same time." There are many innocent reasons for multiple cars to arrive at a house around the same time in the morning, even if only staying a short amount of time. We do not find these facts probative enough to support a reasonable suspicion finding in this particular case.

Having analyzed the facts individually, we are mindful that each fact should not be treated in isolation and that facts which by themselves appear innocent may in the aggregate rise to the level of reasonable suspicion. Nonetheless, we do not find the totality of the circumstances at the time of the stop created a reasonable suspicion of a drug crime or any other criminal activity.

In summary, stopping Spears's vehicle was initially justified by reasonable suspicion of a traffic violation only. Accordingly, the officers' subsequent actions must have been reasonably related in scope to a traffic violation.

**B.     Whether the Law Enforcement Officer's Subsequent Actions Were Reasonably Related in Scope to the Circumstances that Justified the Stop of the Vehicle**

"An officer's subsequent actions are not reasonably related in scope to the circumstances that caused him to stop the vehicle if he detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless he develops reasonable suspicion of additional criminal activity in the meantime." *Pack*, 612 F.3d at 350. Specifically, a stop justified

by only a traffic violation "'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation" and "attend[ing] to related safety concerns," absent reasonable suspicion of additional criminal activity. *Rodriguez v. United States*, 135 S. Ct. 1609, 1612, 1614–16 (2015) (first two alterations in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "If the officer develops reasonable suspicion of additional criminal activity, . . . he may further detain [the] occupants [of the vehicle] for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *Andres*, 703 F.3d at 833 (alterations in original).

The time reasonably required to complete the mission of issuing a traffic ticket can include the time it takes to inspect the driver's license, automobile registration, and proof of automobile insurance; run computer checks; determine whether there are outstanding warrants against the driver; and ask the purpose and itinerary of the trip. *Rodriguez*, 135 S. Ct. at 1615; *Pack*, 612 F.3d at 350. A dog sniff is not part of the mission of issuing a traffic ticket. *Rodriguez*, 135 S. Ct. at 1615. Therefore, absent reasonable suspicion of additional criminal activity, waiting for or conducting a dog sniff cannot prolong a stop justified by only a traffic violation beyond the amount of time reasonably required to complete the mission of issuing a traffic ticket and attending to related safety concerns. *Id.* at 1614, 1616.

Almost forty minutes elapsed from the time the officers initially stopped Spears until the time they began the search of his vehicle, which was commenced due to the receipt of information that other officers had found a large amount of money in Loera's vehicle after stopping Loera. Approximately sixteen and a half minutes after the officers initially stopped Spears, they sat him in the back of the patrol car, and all questioning of him, the pat down for weapons, and the computer checks had been fully completed. Thus, activities

involving the mission of issuing a traffic ticket and attending to related safety concerns were completed, at the very latest, sixteen and a half minutes into the traffic stop.[1]  Spears was detained for almost an additional twenty-three and a half minutes—just sitting in the back of the patrol car—while the officers tried to obtain a drug-sniffing dog, which is not part of the mission of issuing a traffic ticket.  Therefore, detaining Spears beyond the initial sixteen and a half minutes of the stop was not permitted unless a reasonable suspicion of criminal activity arose during those sixteen and a half minutes.  The United States claims the following facts that arose during the stop, combined with the facts previously discussed that occurred before the stop, created a reasonable suspicion of criminal activity: Spears lied about where he was coming from; he appeared nervous; he was evasive, non-compliant, and argumentative; and there was a backpack inside his vehicle in plain view.[2]

As to the purported lie, "the question is whether it was reasonable for someone in [the officer's] shoes to view the answers as suspicious, not whether they are convincing proof that [the defendant] was lying."  *United States v. Pena-Gonzalez*, _ F. App'x _ , 2015 WL 4317820, at *4 (5th Cir. July 16, 2015).  Nonetheless, minor, insignificant, illusory, or reconcilable inconsistencies in a defendant's story are not probative of criminal activity.  *See Davis*, 2015 WL

---

[1] Likely, the reasonable amount of time required to complete the mission of issuing a traffic ticket and attending to related safety concerns was less than sixteen and a half minutes.  However, because reasonable suspicion did not arise during the initial sixteen and a half minutes for reasons explained infra, we need not parse exactly when the mission of issuing a traffic ticket and attending to related safety concerns was reasonably completed.  Indeed, the United States does not contend that the officers even intended to issue a traffic ticket at any time.

[2] The United States also claims the presence of what appeared to be a money counter in plain view contributed to reasonable suspicion.  However, the DEA officer who saw what appeared to be a money counter did not arrive to the traffic stop until well after the initial sixteen and a half minutes of the stop.  Therefore, the presence of what appeared to be a money counter could not have contributed to reasonable suspicion during the time reasonably required to complete the mission of issuing a traffic ticket and attending to related safety concerns.

4931408, at *4; *Pack*, 612 F.3d at 359–60. When the officer that stopped Spears asked him "where he was coming from," Spears said he was coming from "visiting a relative," which the officer believed was an untrue statement based on the information he had received from the other officers. The other officers knew Spears had come from the New York House, where Loera lived. Specifically, the officers knew Spears had parked in the driveway of the New York House for ten to twenty minutes, during which time the officers could not see whether Spears exited the vehicle and went inside the house. However, there is no evidence or contention that any of the officers knew that Loera was not a relative of Spears or that none of Spears's relatives lived at the New York House. Also, there is no evidence or contention that any of the officers knew who, if anyone, lived with Loera at the New York House. Spears was unknown to the officers prior to that day, and the officer did not ask Spears anything about Loera or the New York House. Therefore, we find it was not reasonable for the officer to view Spears's answer about where he was coming from as suspicious, much less that it was lie.

Next, the United States claims the fact that Spears appeared nervous created a reasonable suspicion of criminal activity. The only evidence regarding Spears's nervousness is the officer's testimony that Spears "was nervous"; the officer did not explain why he thought Spears was nervous or name any physical displays of nervousness. In most other cases in which we have found nervousness to be a factor supporting reasonable suspicion, the defendant was described as being more nervous than how Spears was described. *See, e.g.*, *United States v. Wallstrum*, 515 F. App'x 343, 345, 347, 350 (5th Cir. 2013) (arms and hands shaking, eyes twitching, and neck visibly pulsing); *United States v. Wilkerson*, 405 F. App'x 893, 896 (5th Cir. 2010) (ankle slapping, shifty eyes, shaky hands, and trembling body). Here, the non-

15

descriptive, general statement that Spears was nervous is not sufficiently persuasive to create reasonable suspicion.

The United States also claims Spears's evasiveness, non-compliance, and argumentativeness were suspicious. "[E]vasive behavior is a pertinent factor in determining reasonable suspicion," but because "such behavior 'is not necessarily indicative of wrongdoing,'" the "context is key." *Hill*, 752 F.3d at 1036 (quoting *Wardlow*, 528 U.S. at 124–25). The officer testified that while he was questioning Spears, Spears was not giving straight answers, was evasive in responding to questions, and was very non-compliant. The officer further testified that "from [his] experience, the way [Spears] was acting led [him] to believe that [Spears] was going to either try to run or fight." Specifically, the officer testified that he asked Spears whether there was a weapon in the vehicle because he observed Spears rummaging around the center console. At first Spears avoided answering this question with questions of his own, including wondering why he was being asked such a question, but he eventually said he did not have any weapons. Also, Spears refused to step outside his truck when first instructed to do so by the officer that stopped him. When a second officer arrived, they again asked Spears to step outside the truck. Again Spears initially refused, saying he was in a hurry and did not understand why this was necessary for a traffic violation. He complied once threatened with going to jail for non-compliance, which was approximately a minute after being asked the second time. After the pat down, the officers instructed Spears to sit in the back of the patrol car. He complied after protesting for approximately two minutes, asking, in part, why he was being detained. On one hand, such behavior is not a proper response to law enforcement and is pertinent in determining reasonable suspicion, especially in light of the officer's perception based on his experience. On the other hand, such behavior is not necessarily indicative of criminal wrongdoing, and Spears

No. 14-11267

eventually complied with all instructions and answered all questions within approximately two minutes of being asked. After carefully considering all of the evidence in context, including the officer's testimony and the video and audio recording of the traffic stop, we find that Spears's level of evasiveness, non-compliance, and argumentativeness did not rise to such a level that it alone created a reasonable suspicion of a criminal activity under the specific facts of this case.

Lastly, the United States claims that the presence of a backpack inside Spears's vehicle in plain view was suspicious. The officer testified that a backpack is "one of the most common items" used to store money or drugs during drug transactions. We have found reasonable suspicion to stop a van where a DEA agent observed three men load the van with large duffle bags at a suspected "stash house" in the dark due to the deactivation of a motion-sensitive light. *Ibarra-Sanchez*, 199 F.3d at 756–59. Also, we have found probable cause to stop and search a car where an officer observed a suspected drug dealer transfer a canvas bag from his car to another car in a supermarket parking lot, and then observed the car with the bag travel to the city that a confidential informant said the suspected drug dealer was sending drugs to. *United States v. Piaget*, 915 F.2d 138, 140 (5th Cir. 1990). Unlike those cases, in this case the officers did not observe any movement of Spears's backpack. Notably, they did not see Spears enter or exit the New York House with the backpack, nor did they see Spears and Loera exchange the backpack. The first time officers saw the backpack was after stopping Spears's vehicle. While we are considerate of law enforcement's experience with backpacks in drug transactions, the very common occurrence of having a backpack in a vehicle and the multitude of innocent uses for a backpack in a vehicle renders the presence of a backpack in Spears's vehicle of little persuasive value.

17

No. 14-11267

For all of these reasons, we find the totality of circumstances that existed both before the stop and during the initial sixteen and a half minutes of the stop did not create a reasonable suspicion of criminal activity.  In so finding, we have considered the officers' experience and the facts in the aggregate. Because law enforcement officers detained Spears longer than the time reasonably required to issue a ticket for a traffic violation and attend to related safety concerns, without reasonable suspicion of additional criminal activity, his prolonged detention violated the Fourth Amendment.  Accordingly, the district court erred in denying Spears's motion to suppress the evidence obtained as a result of this unlawfully prolonged detention.  Because Spears's conviction was obtained with evidence that should have been suppressed, we vacate Spears's conviction and sentence.[3]

## IV.  CONCLUSION

For the foregoing reasons, the district court's decision denying Spears's motion to suppress evidence is reversed, and Spears's conviction and sentence are vacated.   VACATED AND REMANDED for further proceedings not inconsistent with this opinion.

---

[3] Because we vacate Spears's conviction and sentence on this Fourth Amendment ground, we need not reach the other issues raised on appeal.

No. 14-11267

GREGG COSTA, Circuit Judge, specially concurring:

It is a close call whether the officers had reasonable suspicion to believe that Spears was involved in drug trafficking, if not at the inception of the stop then at least after his interaction with law enforcement. A brief stop in the driveway of a known drug dealer on a day when there was reason to believe a deal was going down; evasive answers to officers; an apparent misrepresentation about where Spears had been ("visiting a relative" is not consistent with staying inside a vehicle in a driveway)—for the reasons well explained in the majority opinion, standing alone these might not amount to much. But add them together, and things start to get suspicious.

I would not decide the reasonable suspicion question, however, [1] because there is a more straightforward basis for suppressing the evidence obtained during the search of Spears's vehicle: even if reasonable suspicion of criminal wrongdoing existed, the traffic stop was unreasonably long. Like the street-corner *Terry* stop on which it is based, a traffic stop supported by reasonable suspicion of wrongdoing must be "temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc). Indeed, given how common routine traffic stops are, it is lengthy roadside detentions that represent the more unusual and greater intrusion on Fourth Amendment interests. *Cf. Rodriguez v. United States*, 135 S. Ct. 1609, 1615-16 (2015) (rejecting *de minimis* rule

---

[1] The district court found that there was probable cause of drug trafficking at the inception of the stop. That would mean officers could have arrested Spears and conducted a search of his vehicle solely on the basis for observing him in the driveway of 1251 New York. The officers apparently did not believe they had this authority, thus the lengthy stop during which they were trying to establish probable cause. Although the inquiry does not depend on the officer's subjective views, I agree with them that visiting a known drug trafficking location alone is insufficient to establish the higher standard of probable cause.

19

that would have allowed officers to prolong a stop for just a few minutes while waiting for a canine to arrive because any unjustified prolonging of stop is unlawful).

The seizure of Spears rose to the level at which those concerns are strong, lasting close to forty minutes before the discovery of the bag of money in Loera's vehicle prompted the search of Spears's vehicle. The district court found that this significant length of time did not pose a constitutional problem for two reasons: 1) "the defendant's resistance to lawful commands"; and 2) the "officer's diligent efforts to dispatch a canine unit to the scene." The first is readily dispelled. Spears delayed the weapons pat down by about a minute and his subsequent transfer to the police car by about two minutes. Both of these events occurred within the first sixteen minutes of the stop, so they cannot be the reason the stop continued for an additional period more than twice that long.

What about the attempts to find a canine, which is often the issue in challenges to the length of a traffic stop? *See, e.g.*, *Rodriguez*, 135 S. Ct. at 1609; *United States v. Pack*, 612 F.3d 341, *modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010). For starters, some testimony indicates that law enforcement had given up on finding a dog. The local police officer who initiated the stop testified that they "were unable to locate a canine that was available" and had stopped looking. There is evidence suggesting the contrary, however, as a recorded radio communication indicates that at least someone was still "working on getting [] one." This general statement, with no specifics about who was being contacted or when, is still likely enough to support the district court's factual determination that the officers were still pursuing a canine.

It is the conclusion at the next step of that analysis—that it was reasonable to continue the stop for forty minutes while those unsuccessful

attempts to find a canine continued—that runs into a problem.  The district court cited *Pack* to support the length of the stop here, noting that it upheld the reasonableness of a stop lasting just under 35 minutes.  But in *Pack*, the canine arrived at the scene 33 minutes after the stop.  *Pack*, 612 F.3d at 345–46 (stop at 8:45 a.m.; canine arrival at 9:18 a.m.).  At that point in this stop, and for a number of minutes that followed, officers were still merely hoping to find a canine.

There is a vast difference between a situation in which a canine has already arrived and one in which a canine has not even been located.  In the former, the end of the "reasonable suspicion" stop is in sight.  If the dog alerts, there is probable cause.  If it does not, the driver should be on his way.  In contrast, the latter situation looks like the "indefinite detention" that the low threshold of reasonable suspicion cannot support.  *Pack*, 612 F.3d at 361–62. It is purely speculative that a dog will ever be found, and the odds of finding one are low given that lengthy efforts to locate the dog had thus far proven unsuccessful.  Any dog that is found at this late juncture is likely to be far away as it would have been logical for officers to first contact nearby canine units. So even if a canine is finally located at minute 40, or 45, or 50, it would likely be well into the second hour of the stop before the canine arrives.

The 35 minutes it took for the *Pack* canine to arrive approaches the outer limits of the length of stops that courts generally allow.  *See United States v. Foreste*, 780 F.3d 518, 527 (2d Cir. 2015) (citing cases that show 30 to 38 minutes as being "the range that this and other courts have found reasonable for similar canine investigations"); *United States v. Hardy*, 855 F.2d 753, 760 (11th Cir. 1988) (50 minutes for dog to arrive reasonable when dog was "immediately" located).  Those cases allowing lengthier stops are ones in which the canine was "on the way" much earlier in the stop.  *See, e.g., United States v. Schlieve*, 159 F. App'x. 538, 540–41 (5th Cir. 2005) (attempt to locate canine

21

officer lasted ten minutes, canine arrived 46 minutes after reasonable suspicion developed and a little more than an hour after initial stop for traffic violation). The government cites no case, nor have I found one, in which forty minutes was held to be a reasonable time in which to still be looking for a dog without any specific lead that one might be available. Keeping a car and its driver on the side of the road for that length of time based on nothing more than a remote hope that a canine might finally turn up is unreasonable.