# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 3, 2025

Lyle W. Cayce
Clerk

No. 24-50030

United States of America,

*Plaintiff—Appellee*,

*versus*

Nikky Nicole Lujan,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 7:23-CR-98-1

_____

Before King, Ho, and Ramirez, *Circuit Judges*.[*]

Per Curiam:[**]

Appellant-Defendant Nikky Nicole Lujan was pulled over for a traffic stop, detained for an additional seven minutes to allow for a K-9 unit to arrive, and then arrested after the K-9 alerted to narcotics and a subsequent search revealed methamphetamine and cash. After her motion to suppress the evidence was denied, she entered a conditional guilty plea. On appeal, she

_____

[*] Judge Ho concurs in the judgment only.

[**] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 24-50030

argues that the district court erred in denying the motion to suppress because the officers lacked reasonable suspicion to justify prolonging the traffic stop until the arrival of the K-9 unit. We AFFIRM.

## I. Background

At the hearing on the motion to suppress, the parties presented the testimony of Patrol Officer Travis Burkholder, an offense report prepared by Narcotics Detective Matthew Sedillo, both of the Midland Police Department (MPD), and Burkholder's dashcam and bodycam footage. Burkholder had been a police officer for "[r]oughly a year and-a-half" at the time of the suppression hearing and had conducted "roughly over 150" traffic stops. Prior to the night of the stop, a cooperating source had informed MPD that Raul Gonzalez was selling large quantities of methamphetamine from his home at 2719 Roosevelt Avenue. Further, multiple sources had informed MPD that Gonzalez's supplier was a woman named "Nikky" who drove a silver Yukon or Tahoe and trafficked large quantities of methamphetamine to Midland from New Mexico.

On the night of the stop, May 26, 2023, MPD participated in a joint task force operation with county, state, and federal authorities. Working with officers surveilling the house at 2719 Roosevelt Avenue, Burkholder and Sedillo were to receive alerts about vehicles, locate those vehicles, and then identify traffic violations to conduct traffic stops of those vehicles. According to the offense report, surveillance officers observed a vehicle pull up to 2719 Roosevelt followed two minutes later by a silver Yukon; shortly thereafter, a man got into the passenger seat of the Yukon, and it pulled away. Burkholder testified that soon after receiving a radio alert that the Yukon was leaving the house, he and Sedillo found it sitting at a red light and prepared to pull it over

2

for a traffic infraction.[1] When the light turned green, they pulled up behind the Yukon and activated overhead emergency lights. Burkholder testified that the Yukon braked, then sped up, and changed lanes before stopping in a parking lot 31 seconds later.

Burkholder approached the Yukon and told Lujan, who was in the driver's seat, to exit the vehicle. Burkholder testified that Lujan seemed nervous and initially did not want to exit the vehicle, and based on his training and experience, such conduct indicated that a person has contraband. When Lujan exited the vehicle, Burkholder explained that he pulled her over for failure to stop before the designated stopping area at the red light. Lujan provided identifying information, and she and the passenger, who identified himself as Gonzalez, both told Burkholder that they were coming from Lujan's house on Delano Avenue and were going to Odessa to pick up Lujan's RV that had broken down. Burkholder described Lujan as exhibiting nervous behavior, such as fidgeting and speaking erratically while waiting outside of the vehicle.

Around five minutes into the stop, Burkholder requested a K-9 unit. Around six minutes and 15 seconds into the stop, Burkholder completed running background checks on Lujan and Gonzalez. The K-9 arrived about 13 minutes and 15 seconds into the stop and alerted to the presence of narcotics. A subsequent search revealed methamphetamine under the hood and cash in the glove compartment. Officers then executed search warrants at Lujan's Delano residence and Gonzalez's Roosevelt residence, which uncovered cash, weapons, and drugs. A grand jury charged Lujan with

---

[1] Officers in an unmarked vehicle were directly behind the Yukon at the red light and relayed to Burkholder that they had observed the Yukon fail to make a proper stop at the light.

conspiracy to possess with intent to distribute 50 grams or more of actual methamphetamine and possession with intent to distribute the same.

Lujan moved to suppress the evidence, arguing the officers abandoned the mission of the traffic stop and lacked reasonable suspicion to extend the stop to wait for a K-9 unit. The district court denied the motion to suppress concluding: (1) that prolonging the stop for around 10 minutes to wait for the arrival of a K-9 unit was per se reasonable, and (2) alternatively, that even if the 10-minute delay was unreasonable, officers had developed reasonable suspicion of additional criminal activity to prolong the detention. Pursuant to a plea agreement, Lujan reserved the right to appeal the ruling on her motion to suppress and entered a conditional guilty plea. She was sentenced to concurrent 340-month terms of imprisonment and concurrent five-year terms of supervised release. She timely filed a notice of appeal.

## II. Discussion

### A. Standard of Review

When reviewing a suppression ruling, this court reviews factual findings for clear error and the constitutionality of law enforcement conduct de novo. *United States v. Hearn*, 563 F.3d 95, 101 (5th Cir. 2009). "Whether officers had reasonable suspicion to support an investigative stop is a question of law." *United States v. Alvarez*, 40 F.4th 339, 344 (5th Cir. 2022). "Factual findings are clearly erroneous only if a review of the record leaves this Court with a definite and firm conviction that a mistake has been committed." *Hearn*, 563 F.3d at 101 (internal quotation marks and citation omitted). "We will uphold the district court's ruling 'if there is any reasonable view of the evidence to support it.'" *Alvarez*, 40 F.4th at 344 (quoting *United States v. Michalik*, 5 F.4th 583, 588 (5th Cir. 2021)).

The evidence is viewed in the light most favorable to the prevailing party, which in this case is the government. *United States v. Lim*, 897 F.3d

673, 685 (5th Cir. 2018). Review is "particularly deferential where denial of the suppression motion is based on live oral testimony because the judge had the opportunity to observe the demeanor of the witnesses." *Id.* (internal quotation marks and citation omitted). However, when live testimony "blatantly" conflicts with video evidence, this court views the "facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007); *see also United States v. Anderson*, No. 23-50110, 2024 WL 2829243, at *1 (5th Cir. June 4, 2024) (per curiam) (applying *Scott v. Harris* on appellate review of a motion to suppress). But if the video evidence is "ambiguous[,]"the rule in *Scott v. Harris* "has no application." *Aguirre v. City of San Antonio*, 995 F.3d 395, 410 (5th Cir. 2021).

## B. Analysis

The legality of a traffic stop is analyzed in two parts pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). First, this court examines "whether the officer's action was justified at its inception." *Id.* Lujan does not contest that the initial stop was justified. Second, this court considers "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop" in the first place. *Brigham*, 382 F.3d at 506. A traffic stop "becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Rodriguez v. United States*, 575 U.S. 348, 350–51 (2015) (internal quotation marks, brackets, and citation omitted). And a dog sniff is not part of the mission of a traffic stop. *Id.* at 355–56. However, "[i]f the officer develops reasonable suspicion of [additional criminal] activity 'in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed.'" *United States v. Reyes*, 963 F.3d 482, 488–89 (5th Cir. 2020) (quoting *United States v. Banuelos-Romero*, 597 F.3d 763, 767 (5th Cir. 2010)).

No. 24-50030

### 1. Per Se Reasonable

The district court first held that "[d]efendants have offered no legal authority showing that anything close to a 10-minute traffic stop is unreasonably prolonged—because it isn't." The district court cited *United States v. Smith*, 952 F.3d 642, 650 (5th Cir. 2020), stating that this court has held "that prolonging a traffic stop around 10 minutes before deploying a K-9 unit for a drug sniff was not unreasonable." This misreads *Smith*. In the portion of *Smith* relied on by the district court, this court had already determined that officers had reasonable suspicion to extend the stop. *See Smith*, 952 F.3d at 650–51. Indeed, as the *Smith* court noted, "[t]here is no hard-and-fast time limit for 'reasonable' traffic stops." *Id.* at 647. Therefore, the district court erred by ruling that, after completing the mission of the traffic stop, prolonging the stop for around 10 minutes was per se reasonable. *See Rodriguez*, 575 U.S. at 350–51.

### 2. Reasonable Suspicion

Second, the district court held alternatively that "even if a mere 10 minutes . . . prolonged the traffic stop," then "[t]he evidence presented at the hearing revealed multiple facts that would cause an officer to develop a reasonable suspicion that Defendants were participating in other criminal activity." "Reasonable suspicion is a low threshold," requiring "only some minimal level of objective justification" that is still "more than a mere hunch." *Smith*, 952 F.3d at 648 (internal quotation marks and citation omitted). It "exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Id.* at 647–48 (internal quotation marks, brackets, and citation omitted).

Courts must look at the totality of circumstances in determining reasonable suspicion instead of conducting a "'divide-and-conquer analysis,'

under which a court examines and rejects individually each of a number of factors that the police cite as having created reasonable suspicion." *United States v. Pack*, 612 F.3d 341, 358 (5th Cir.), *opinion modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010). Thus, it is improper for a court to refuse to find reasonable suspicion because each of a set of circumstances has an innocent explanation. *Id.* And "courts must allow law enforcement officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."[2] *Brigham*, 382 F.3d at 507 (internal quotation marks and citation omitted). But even as we recognize the need for officers to make inferences based on a suspect's behavior, "[t]here must be some articulable premise—some fact linking that behavior to reasonably suspected criminality," because "[w]ithout that premise, there can be no objectively logical reason to impute criminality to a lawful range of behavior."[3] *United States v. Monsivais*, 848 F.3d 353, 362 (5th Cir. 2017). Therefore, the court "cannot infer reasonable suspicion" from certain

---

[2] Lujan argues that no deference should be given to Burkholder because he was not an experienced officer. Indeed, at the time of the hearing, Burkholder had only 18 months experience and therefore had even less at the time of the stop. Further, Burkholder agreed at the hearing that he did not have any "advanced experience." *Cf. United States v. Estrada*, 459 F.3d 627, 629 (5th Cir. 2006) (noting officer's "extensive classroom training and on-the-job experience" as reinforcing officer's reasonable suspicion that marks on outside of car were consistent with modifying fuel tank to hide contraband). Ultimately, "[w]hile Appellant challenges [Burkholder's] experience as [a] police officer[], this is but one factor in the totality analysis, and is not determinative." *United States v. Neufeld-Neufeld*, 338 F.3d 374, 382 (5th Cir. 2003).

[3] Although at one point this circuit required particularized suspicion of a *specific* crime, that has since been abrogated in favor of a generalized suspicion of criminal activity. *See Pack*, 612 F.3d at 355. Despite this, cases applying the previous standard can still be illuminating where they demonstrate that a specific factor is "too minor and insignificant to give rise to any reasonable suspicion of *any* criminal activity." *Id.* at 360 (noting that the minor inconsistencies in stories described in three prior cases under older test would also not give rise to reasonable suspicion under current test).

behaviors when "there is no rational reason to conclude that law-abiding citizens are less likely" to engage in those behaviors. *United States v. Rangel-Portillo*, 586 F.3d 376, 381 (5th Cir. 2009); *see also United States v. Chavez-Chavez,* 205 F.3d 145, 148 (5th Cir. 2000) ("A factual condition that is consistent with alien smuggling does not provide reasonable suspicion if that condition also occurs even more frequently in the law-abiding public.").

The parties agree that the traffic stop's mission was complete when background checks were returned around six minutes and 15 seconds into the stop; they disagree as to whether at that point the officers had reasonable suspicion to prolong the stop until the K-9 unit arrived seven minutes later. The district court's order cited the following as supporting reasonable suspicion: Lujan (1) kept driving for nearly 1,000 feet after police lights were activated, (2) admitted she had been previously incarcerated for methamphetamine possession, and (3) lied about where she was coming from by omitting that she stopped at a house that police were surveilling for drug trafficking. On appeal, the government points to three additional factors, not explicitly cited by the district court, as supporting reasonable suspicion: Lujan's (4) nervousness, (5) hesitancy to leave the vehicle, and (6) "implausible itinerary." Lujan challenges each finding and argues that the facts do not amount to reasonable suspicion of criminal activity.

None of these factors alone per se suffices to create reasonable suspicion. Conversely, each of these factors can support reasonable suspicion in certain contexts. Therefore, we investigate each factor individually to determine whether it contributes to reasonable suspicion in this context, and then evaluate whether the totality of contributing factors create reasonable suspicion. *See, e.g.*, *Alvarez,* 40 F.4th at 348 (conducting analysis by "consider[ing] in detail each factor relied on by the government"). While doing so, we remain cognizant that even if Lujan has "an innocent explanation for each of her actions," and "some of them . . . provide little

support for reasonable suspicion," together they can still give an officer "more than a mere hunch of illegal activity." *See Reyes*, 963 F.3d at 489.

### i. Continued Driving and Acceleration

Here, the district court found that Lujan "kept driving for almost [1,000] feet after being hit with the patrol car's lights, which Officer Burkholder testified, based on his training and experience, generally happens when individuals seek to conceal or destroy narcotics in the vehicle."

A modest delay in stopping time, without more, does not "give rise to reasonable suspicion." *United States v. Jenson*, 462 F.3d 399, 405 (5th Cir. 2006). Drivers may take "different amounts of time, especially at night, to identify the lights of the car behind them as coming from a police car and not from another emergency services vehicle," and "to recognize that the officer intends for him to stop and safely turn onto the shoulder, as opposed to, for example, taking the next exit so as to be out of the danger of traffic." *Id.* In *Jenson*, this court held that, even though the defendant did not hit his brakes when the officer activated his overhead lights, "thirty seconds to a minute was a reasonable amount of time for [the defendant] to respond to the flashing of the emergency lights." *Id.; see also United States v. Jackson,* No. EP-10-CR-1628-KC, 2010 WL 4023553, at *4 (W.D. Tex. Oct. 13, 2010) (noting that twenty seconds it took driver to pull over was "equal to or less than the time taken by most other motorists whose traffic stops were recorded on the same video," and thus provided "no basis for finding that Defendant engaged in a 'slow roll' stop").

Burkholder testified that when the police lights activated, Lujan drove past the entrance to a shopping center and then "began to slow roll towards

[the next intersection]."[4] He agreed, however, that it is not uncommon for motorists to find a safe place to stop. And as Lujan argues and the dashcam video supports,[5] Lujan "would have had to forcefully apply her brakes and make a sharp right turn" to turn into the shopping center. Burkholder further testified that after the entrance to the shopping center, other road conditions made it "not a safe place to pull over," and that Lujan stopped "right after" those conditions. Although Burkholder also testified that the officers had to "bump[] the siren twice" to get Lujan to pull over, the video shows that Lujan had already pulled off the road when the siren first "bumped." Because the video contradicts the testimony regarding whether Lujan could have stopped sooner and at most, Lujan continued for 31 seconds before stopping, this "delay" alone does not meaningfully contribute to reasonable suspicion.

Although the court in *Jenson* found a 30-second to one-minute delay reasonable, it also noted that even a shorter delay could raise reasonable suspicion when coupled with "further context, such as erratic driving, acceleration, or passenger movement inside the vehicle." 462 F.3d at 405. Here, Burkholder testified that Lujan accelerated after hitting the brakes.

_____

[4] Burkholder testified that a "slow roll" is significant because it means that "the occupants could possibly be trying to hide any type of narcotics or contraband inside the vehicle," and that he had observed slow rolls "quite a few times."

[5] The dashcam video shows that when the emergency lights activated, Lujan braked, activated her turn signal, and moved into the right lane. As Lujan entered the right lane, the road begins to widen, and a white stripe appears, creating a turn lane into a shopping center. Though the white stripe ends at the entrance to the shopping center, the lane continues and creates a new right lane. When the police vehicle begins to change lanes following Lujan, her Yukon was parallel to the turn lane into the shopping center. Lujan maintained the same angle and continued moving into the new right lane. As Lujan argues, where she entered the new right lane, her vehicle appears to be perpendicular to the entrance of the shopping center as the rear driver's side tire crosses over the white stripe at the end of the turn lane.

No. 24-50030

While the video does not obviously depict Lujan accelerating, it provides no indication of speed whatsoever, and therefore is ambiguous on the issue, meaning we must credit Burkholder's testimony. [6] *See Aguirre*, 995 F.3d at 410. Although this brief acceleration may not be especially probative of criminal activity, it can still contribute to reasonable suspicion.

### ii. Prior Imprisonment

The district court also relied on Lujan's admission to Burkholder—that she had previously been imprisoned for possessing methamphetamine—as supporting reasonable suspicion.[7] Prior arrest, conviction, or imprisonment can support reasonable suspicion when coupled with other suspicious facts. *Compare Reyes*, 963 F.3d at 489 n.6 (noting prior conviction for drug possession as a factor supporting reasonable suspicion); *with United States v. Jones,* 234 F.3d 234, 242 (5th Cir. 2000) (finding no reasonable suspicion of any crime despite prior arrest for drug possession and other factors).

---

[6] Burkholder did not know the speedometer reading at this point, but testified "then the brake lights disengaged, and that's when it looked like it sped up past that turn, going into those apartment spots." The district court found Lujan continued for 897 feet after Burkholder activated the emergency lights. The parties agree Lujan took 31 seconds to stop. Taken together, this means Lujan's average speed was just under 19.73 miles per hour. As Burkholder admitted, Lujan "did not try to flee."

[7] When Burkholder was cross-examined on whether Lujan's admission was an "additional reason to believe there could be something going on there," he responded "[n]o," that it was "just an investigative question I ask," and agreed it was not part of the "overall calculus" of the stop, but instead just a question he asks "on most every traffic stop." But, even if Burkholder did not rely on Lujan's conviction, the key question is "whether these historical facts, viewed from the standpoint of an *objectively reasonable* police officer, amount to reasonable suspicion." *Reyes*, 963 F.3d at 488 (emphasis added). Therefore, an "officer's subjective motivations are irrelevant." *United States v. Goodin*, 835 F. App'x 771, 780 (5th Cir. 2021).

No. 24-50030

### iii. Statements About Trip Origin

Finally, the district court found that Lujan contradicted surveillance and "lied about where [she and the passenger] were coming from—a house which testimony revealed was [once] known for selling narcotics." Untruthful statements can be a factor in developing reasonable suspicion. *See United States v. Andres*, 703 F.3d 828, 833–34 (5th Cir. 2013). In such a situation, the issue is whether it was reasonable for an officer "to view the answers as suspicious, not whether they are convincing proof that [the defendant] was lying." *United States v. Pena-Gonzalez*, 618 F. App'x 195, 200 (5th Cir. 2015) (per curiam) (citing *United States v. Fishel*, 467 F.3d 855, 857 (5th Cir. 2010)). But generally, "minor, insignificant, illusory, or reconcilable inconsistencies in a defendant's story are not probative of criminal activity." *United States v. Spears*, 636 F. App'x 893, 902 (5th Cir. 2016).

Here, Burkholder asked Lujan where she was coming from, and she replied from her house on Delano. Burkholder believed the statement false based on information that he received from other officers who had observed Lujan's Yukon leaving 2719 Roosevelt.[8] Lujan counters that her statement was reconcilable with the facts in the offense report, and therefore a reasonable officer would not view it as a lie nor probative of criminal activity.

Two prior decisions of this court are illustrative. In *United States v. Spears*, an officer asked the defendant "where he was coming from," and the defendant replied from "visiting a relative." 636 F. App'x at 902. The officer believed this a lie based on information he had received from other officers, who knew that shortly before being pulled over, the defendant was parked in

---

[8] Burkholder's testimony on this issue is consistent with the bodycam video. Burkholder further testified that if he left his house, picked up a friend, and was asked where he was coming from, he would state that he was coming from picking up a friend but agreed that another person might state that they were coming from their own house.

the driveway of a house connected to drug dealing for ten to twenty minutes. *Id.* Because the officers did not know whether any of the defendant's relatives lived at that house, nor did the arresting officer ask the defendant about this house, "it was not reasonable for the officer to view [the defendant]'s answer about where he was coming from as suspicious, much less that it was lie." *Id.* Conversely, in *United States v. Andres*, an officer asked the defendant where he was coming from, and the defendant responded he was coming from a certain town where he had used his truck to deliver a car. 703 F.3d at 831. However, the officer knew that another officer had earlier spotted the defendant coming from south of that town, and given the time that had elapsed, would not have had time to make a stop. *Id.* at 833. Therefore, the defendant's "untruthful answer created further suspicion justifying continued detention." *Id.* at 834.

This falls somewhere between *Spears* and *Andres*. Unlike in *Spears*, where officers did not know whether the defendant had any relatives at the house in question and did not ask any follow up questions, here Burkholder knew that Lujan was not coming directly from her house. Further, the government argues it was reasonable for Burkholder to infer Lujan intentionally omitted her stop at the house, because Burkholder knew that both the house, and the vehicle Lujan was driving, had been identified in the offense report.[9] Conversely, unlike *Andres*, where the officer knew the

---

[9] Information in Detective Sedillo's offense report can be imputed to Burkholder under the collective-knowledge doctrine. *See United States v. Zuniga*, 860 F.3d 276, 283 (5th Cir. 2017) ("Under the collective knowledge doctrine, an officer initiating the stop or conducting the search need not have personal knowledge of the evidence that gave rise to the reasonable suspicion or probable cause, so long as he is acting at the request of those who have the necessary information."). The government cites the offense report only as a basis for Burkholder to infer Lujan's omission of the stop at Roosevelt may have been intentional, not to suggest that information from the cooperating sources itself created reasonable suspicion. Therefore, we need not analyze whether information from the cooperating sources has sufficient "indicia of reliability" to create reasonable suspicion.

defendant could not have completed his described itinerary, here as Burkholder admitted, it was possible for Lujan to have innocently omitted a brief stop to pick up a passenger. While Lujan's story was a potentially "reconcilable" inconsistency, *see Spears*, 636 F. App'x at 902, it was also reasonable for Burkholder "to view the answers as suspicious," even if not "convincing proof that [she] was lying." *Andres*, 703 F.3d at 833–34; *see also United States v. Berry*, 664 F. App'x 413, 419 (5th Cir. 2016), *as revised* (Dec. 14, 2016) (per curiam) (finding officer's testimony—that he believed defendant to be lying because defendant's story contradicted information officer received from other law enforcement agency—a contributing factor in creating reasonable suspicion).

### iv. Implausible Story

The government cites additional factors, not relied on by the district court, to support reasonable suspicion. First, it argues that Lujan provided an implausible story that she was picking up her RV on the side of the road in a town 30 minutes away and that "[t]he district court credited [Burkholder's] testimony" that her story was suspicious given the time of day. "Implausible stories about the purpose of [one's] travel" can contribute to reasonable suspicion. *See Reyes*, 963 F.3d at 489 (5th Cir. 2020).

Here, the district court did not credit Burkholder's testimony on this issue, reference the time of day, or find that the story was suspicious. Burkholder never explained why he believed the time of day made the story implausible, but merely that it "just seemed funny that anybody would want to leave their residence and go pick up a trailer at 11:30." But Lujan explained

---

*See United States v. Zamora*, 661 F.3d 200, 207 (5th Cir. 2011) (quoting *United States v. Roch*, 5 F.3d 894, 898 (5th Cir. 1993)).

to Burkholder: friends were supposed to deliver the RV to her house, but instead abandoned it, and she was worried it would be stolen. Stories this court has found implausible often involve traveling a significant time or distance for a relatively minor purpose or short stay. *See, e.g.*, *Reyes*, 963 F.3d at 489 (three hour trip to pick up friend's children to take them to school); *Smith*, 952 F.3d at 649 (driver traveling with two other adult men from Texas to Indiana to pick up a small icemaker that could be shipped and would not require three people to pick up); *United States v. Gonzalez*, No. 23-10963, 2024 U.S. App. LEXIS 16731, at *9 (5th Cir. July 9, 2024) (per curiam) (traveling from California to Alabama for family reunion, despite no family being from Alabama, and not knowing where in state reunion would be held). In contrast to these precedents, traveling 30 minutes at night to pick up an RV qualifies as among those "travel plans whose implausibility is merely trivial or illusory" and thus "do not suffice to justify an extended detention." *United States v. Davis*, 620 F. App'x 295, 299 (5th Cir. 2015).

### v. Nervousness

The government also argues that due deference should be given to Burkholder's testimony that Lujan's nervousness made him suspect that she was hiding something. At the suppression motion, Burkholder testified Lujan "seemed to be nervous" based on "[j]ust different types of gestures as to not wanting to get out of the vehicle." But when asked to describe these gestures, Burkholder pointed, not to any particular gestures, but rather to Lujan "holding onto her phone, not making any movement towards getting out of the vehicle." The body camera confirms Lujan did not make any specific gestures, showing that when Burkholder approached the driver's door, the window was rolled down, and Lujan was holding her wallet and appeared to be reaching for something inside. After a ten-second conversation about exiting the vehicle, described *infra*, Lujan exited.

No. 24-50030

After exiting the vehicle, Burkholder testified that Lujan "seemed to speak erratically, fast," and "seemed fidgety at points." Burkholder's assessment was neither relied on by the district court, nor is it readily apparent in any of the videos. Regardless, even accepting Burkholder's description, at no point did Lujan's behavior rise to the level of nervousness this court has generally observed as contributing to reasonable suspicion. *See, e.g.*, *Fishel*, 467 F.3d at 856 ("extremely nervous with a tremor in his voice"); *Pack*, 612 F.3d at 345 ("breathing heavily, his hands were shaking, and his carotid artery was visibly pulsing"); *Pena-Gonzalez*, 618 F. App'x at 196 ("carotid artery visibly pulsed, his faced twitched, and his breathing was labored"). Therefore, "the non-descriptive, general statement that [Lujan] was nervous is not sufficiently persuasive to create reasonable suspicion." *Spears*, 636 F. App'x at 903; *see also Monsivais*, 848 F.3d at 359 ("[W]e often give little or no weight to an officer's conclusional statement that a suspect appeared nervous." (quoting *United States v. Portillo–Aguirre*, 311 F.3d 647, 656 n.49 (5th Cir. 2002))).

## vi. Hesitancy to Leave Vehicle

The government also argues that due deference should be given to Burkholder's testimony that Lujan's initial refusal to exit the vehicle made him suspect that she was hiding something. As he approached Lujan's window, Burkholder immediately told her to step out of the vehicle. Lujan softly asked why, sounding confused. Burkholder repeated for her to step out of the vehicle, and then opened the driver's door. Lujan again asked why, and when Burkholder responded, "because I'm asking you to step out of the vehicle," Lujan stated that there must be a reason. Burkholder replied he would take Lujan to jail for interference if she did not get out of the car, and she began to comply about 10 seconds after the initial request.

No. 24-50030

In cases where the court has found refusal to exit a vehicle suspicious, the occupant has generally been significantly slower to comply. *See, e.g.*, *United States v. Cortez*, No. 21-50904, 2023 WL 6162768, at *5 (5th Cir. Sept. 21, 2023) (noting "it took almost fifteen minutes—to the point where the officers were considering breaking the window—for [defendant] to comply with the officers' instructions"); *Reyes*, 963 F.3d at 489 (5th Cir. 2020) (noting driver's "persistent reluctance" and extreme hesitation to leave vehicle). In a case where a driver complied only after a full minute had passed since the officer's second request, the arrival of an additional officer, and being threatened with jail, this court still found that non-compliance added little to reasonable suspicion. *See Spears*, 636 F. App'x at 902. Indeed, it is hard to imagine Lujan could have exited the vehicle significantly faster without doing so unprompted—which itself would have *increased* reasonable suspicion. *See United States v. Goodin*, 835 F. App'x 771, 780 (5th Cir. 2021); *cf. Pena-Gonzalez*, 618 F. App'x at 199 (expressing concern that court's treatment of certain factors "as indicators of criminal activity risks putting drivers in a classic 'heads I win, tails you lose' position").

### vii. Totality of the Circumstances

After analyzing each factor individually, we are left with the following: brief, minimal acceleration after initially braking when police activated their emergency lights; prior imprisonment; a statement omitting a stop at a house officers knew to be under surveillance for drug trafficking; a travel itinerary that "seemed funny"; non-descript nervousness; and brief hesitation to leave the vehicle.

As in *Spears*, this case presents a "close call." *Spears*, 636 F. App'x at 904 (J. Costa, concurring). Burkholder knew Lujan had prior drug convictions, had just left a house under surveillance for drug dealing, and had omitted that stop when asked where she was coming from. While her brief

No. 24-50030

acceleration, "funny" itinerary, generalized nervousness, and brief hesitation may add little, all the factors taken together tip the scales in favor of upholding the district court's ruling on the motion to suppress because "there is [a] reasonable view of the evidence to support it." *See Alvarez*, 40 F.4th at 344 (quoting *Michalik*, 5 F.4th at 588).

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's judgment denying the motion to suppress.