# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-40406

UNITED STATES OF AMERICA,

United States Court of Appeals
Fifth Circuit

**FILED**

May 14, 2015

Lyle W. Cayce
Clerk

Plaintiff - Appellee

v.

MELVIN EUGENE COLEMAN, JR.; LENNOARD RAY HARE, also known as Leo, also known as Griz,

Defendants - Appellants

Appeals from the United States District Court
for the Eastern District of Texas
USDC No. 4:12-CR-97

Before REAVLEY, SMITH and GRAVES, Circuit Judges.

PER CURIAM:*

Lennoard Hare and Melvin Coleman were found guilty by a jury of conspiracy to distribute or possess with the intent to distribute marijuana and/or cocaine. Both challenge their convictions and Hare challenges his life sentence. We affirm.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-40406

# I. Factual and Procedural Background

## A.    Pre-Trial Proceedings

In June 2012, a grand jury returned the first-superseding one-count indictment against Lennoard Ray Hare, Natasha Williams, Kimberly Brown, Melvin Coleman, LaTonya Wadlington and LaSonya Hall, charging them with conspiracy to distribute or possess with the intent to distribute 5 kilograms or more of cocaine, 1,000 kilograms or more of marijuana, and less than 28 grams of cocaine base (crack cocaine).  21 U.S.C. §§ 841, 846.  All the co-defendants except Hare and Coleman pleaded guilty.

Before trial, Coleman filed a motion in limine asking the court to exclude statements he made during a May 2011 traffic stop because of *Miranda* violations.  This motion effectively served as an untimely motion to suppress. The district court noted that it was untimely as a motion to suppress but held a hearing.  During the hearing, Greenville Police Department Officer Chris Rosamond testified that he stopped Coleman's vehicle for following too closely and failing to signal a lane change.  Rosamond had also received information from DPS officers that they suspected that Coleman might be involved in a narcotics violation. At the beginning of the stop, Rosamond asked where Coleman was traveling from, and Coleman said that he was coming from Tennessee after visiting with family.  The car was rented in the name of a woman not present, and Coleman was unable to produce a rental agreement. Rosamond learned that Coleman had a pending arrest warrant for unpaid child support and began waiting for confirmation that it was still outstanding. Based on the lack of a rental agreement and what he described as Coleman's evasive answers, Rosamond asked for consent to search the vehicle, which Coleman gave.  Rosamond asked Coleman if he had any narcotics, weapons, or large sums of money in the car and patted Coleman down, all of which he normally did in similar situations.  Coleman responded that he always carried

2

No. 14-40406

money with him.  Rosamond asked Coleman how much money he had in the car, and Coleman replied that he had $80,000.[1]  During the search, Rosamond found approximately $186,000 in cash in the vehicle.  Coleman was eventually arrested on the outstanding warrant.

The district court denied the motion in limine/motion to suppress the statements made during the stop, concluding that Coleman was never subjected to custodial interrogation and *Miranda* warnings were not required.

B.     *Trial Evidence*

Trial evidence showed that in 2010, Nika Keith became the target of a drug investigation by the Texas Department of Public Safety, which eventually led officers to an associate of Keith's, Defendant-Appellant Hare.  Keith pleaded guilty and began to cooperate with DPS, including making recorded phone calls to Hare during which they discussed drug trafficking.  DPS officers began conducting surveillance on Hare.  A January or February 2011 search of a warehouse that Hare frequented resulted in the seizure of large scales, plastic wrap, remainders of large amounts of marijuana, and a hat that bore the name "Grizzly Corporation," a company that belonged to Hare.  Officers also observed Hare frequenting co-defendant Natasha Williams's house in the Cedar Valley area of Dallas.  An April 2011 search of that house resulted in the seizure of seven pounds of marijuana, eight empty kilogram wrappers, wrapping material for drugs and money, 13.58 grams of crack cocaine, and $20,700 in cash.

In May 2011, pursuant to a court order, Hare's phone was tracked via GPS to Kentucky and back to Dallas.  On May 13, 2011, the phone was again

---

[1] There was some discrepancy between Rosamond's testimony during the hearing on the motion and his trial testimony regarding whether Coleman "volunteered" that he had $80,000 or whether he was responding to Rosamond when he made that statement.  The video of the traffic stop clearly shows that Coleman was responding to specific questions from Rosamond.

No. 14-40406

tracked traveling between Dallas and Kentucky. DPS agents set up surveillance on Hare's route back to Dallas. Two vehicles were observed. One was a black Lexus belonging to co-defendant Kimberly Brown, which Brown was driving with Hare as a passenger. The other was a 2011 white Ford Explorer driven by Defendant-Appellant Coleman. Agents observed the two vehicles traveling together, including getting on and off of the highway together, and receipts indicated they purchased gas together. Both vehicles were stopped by local law enforcement officers in Texas for traffic violations. During the stops, officers found approximately $111,000 in Brown's car and $186,000 in Coleman's Explorer.

Following these traffic stops, DPS officers executed a search warrant for Brown's residence in Duncanville, Texas. They found food saver bags and food saver machines that seal up the bags, which are materials commonly used for packaging narcotics. An arrest warrant for Hare and a search warrant for his residence in Midlothian, Texas, were executed by officers in January 2012. During that search, officers found approximately $21,000 in coins in a fountain in front of Hare's house, a money counter box, and a .44 magnum pistol.

Keith, Williams, Brown, and co-defendant LaSonya Hall each testified at trial. Nika Keith testified that Hare sold him about 50 pounds of marijuana per week from 2004 through Keith's arrest in 2010, for a total of approximately 4,000 pounds of marijuana. Keith further testified that Hare sold him between 20 and 50 kilograms of cocaine from 2007 through 2010. Keith also stated that he saw bags of drugs in a Glenn Heights house that belonged to Hare's girlfriend, "Tasha, Natasha, something like that."

Natasha Williams testified that Hare was her boyfriend and that he used her two houses to store substantial amounts of cocaine, marijuana, and money. She testified that Keith came to her house in Glenn Heights to buy marijuana

No. 14-40406

from Hare. Williams testified that the marijuana, kilogram wrappers, and money found in the April 13, 2011, search of her house belonged to Hare.

Kimberly Brown testified that she, Hare, and Coleman took two trips to Louisville, Kentucky, selling 10 kilograms of cocaine each time. On each trip, Coleman transported the cocaine in a separate vehicle. On both trips, Brown, Hare, and Coleman stayed at the Galt House Hotel in two different rooms. Records from the Galt House Hotel confirmed that Coleman was registered on April 21, 2011, for one night and that both Coleman and Brown were registered to stay at the hotel from May 11 through May 13, 2011. Brown testified that Coleman kept the cocaine in his room, brought it to Hare and Brown's room to sell, took the money from the sales back to his room, and drove back to Texas with all or most of the money. Phone records obtained and analyzed by the DEA showed 104 calls between Hare's phone and Coleman's phone between May 11 and May 13, 2011. Brown testified that she and Hare subsequently made a third trip to Kentucky to sell 300-400 pounds of marijuana, and a fourth trip to sell 10 kilograms of cocaine.

LaSonya Hall testified that she transported marijuana from Dallas to Oklahoma for Hare multiple times. Hall testified that she would also transport the money for the marijuana from Oklahoma to Hare in Dallas. On one of those occasions, she was stopped by law enforcement with eight pounds of marijuana. In her plea agreement, she accepted responsibility for transporting a total of 250 pounds of marijuana for Hare.

Hare and Coleman were both convicted after a joint jury trial. The jury found Hare guilty of conspiracy to distribute or possess with intent to distribute 1,000 kilograms of marijuana and 5 kilograms of cocaine. The jury found Coleman guilty of conspiracy to distribute or possess with intent to distribute 5 kilograms of cocaine.

5

No. 14-40406

Coleman filed a written motion for new trial, based on the admission of the statements he made during the traffic stop. The district court found that Coleman had waived his arguments for suppression by not raising them before trial, and that the motion should be denied on the merits for the same reasons it denied the untimely motion to suppress.

Hare was sentenced to life imprisonment and five years of supervised release. Coleman was sentenced to a mandatory minimum 120 months of imprisonment and five years of supervised release. Both Hare and Coleman appeal their convictions, and Hare appeals his sentence.

## II. Discussion

Coleman and Hare each raise three issues on appeal. Coleman argues that the district court should have suppressed statements he made during the May 13, 2011, traffic stop, and that the court abused its discretion by denying his motion for new trial based on the admission of those statements. Both Hare and Coleman claim that the evidence presented at trial was insufficient to support their convictions. Hare also argues that the district court abused its discretion in calculating the drug weight attributable to him at sentencing, and that that his life sentence constitutes a violation of the Eighth Amendment. We address each issue in turn.

*A.    Motion to Suppress and Motion for New Trial (Coleman)*

Coleman argues that statements he made during the May 13, 2011 traffic stop should have been suppressed because they were made without *Miranda* warnings. He raises this issue both as a challenge to the denial of his motion in limine, which was effectively an untimely motion to suppress, and as a challenge to the denial of his motion for a new trial. Coleman asserts that two statements should be suppressed: the statement he made to Rosamond that he was returning from Tennessee and the statement that he had $80,000 in the car. Rosamond testified about the statements, and the prosecution

6

referenced both statements at trial to argue that Coleman was untruthful with Rosamond because he was trying to cover up his drug trafficking.

Coleman suggests that, in considering the denial of his motion in limine, we should review factual findings for clear error and legal conclusions de novo, because the district court actually reached the merits of the motion. *See United States v. Gomez*, 623 F.3d 265, 268 (5th Cir. 2010); *United States v. Marx*, 635 F.2d 436, 441 (5th Cir. Unit B Jan. 1981). The government argues that plain error review is appropriate, because Coleman forfeited the error by failing to raise it by the pre-trial deadline for a motion to suppress.[2] The district court's denial of a motion for new trial is reviewed for an abuse of discretion. *United States v. Villareal*, 324 F. 3d 319, 325 (5th Cir. 2003).

We need not resolve the standard of review applicable to the denial of Coleman's untimely motion to suppress. Even reviewing the facts for clear error and the law de novo, the district court committed no error.

"*Miranda* warnings must be administered prior to 'custodial interrogation.'" *United States v. Bengivenga*, 845 F.2d 593, 595 (5th Cir. 1988) (en banc) (quoting *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)). "A suspect is . . . 'in custody' for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Id*. at 596. "Two discrete [inquiries] are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and

---

[2] Federal Rule of Criminal Procedure 12 has been amended to no longer provide that failure to file a motion to suppress by the pre-trial deadline results in waiver, instead providing that a court may consider an untimely motion "if the party shows good cause." Fed. R. Crim. P. 12(c).

leave." *United States v. Cavazos*, 668 F.3d 190, 193 (5th Cir. 2012) (quoting *J.D.B. v. N. Carolina*, 131 S.Ct. 2394, 2402 (2011)). A determination of whether a defendant is "in custody" for *Miranda* purposes depends on the "totality of circumstances." *Id.* Some important factors include: (1) the length of the questioning; (2) the location of the questioning; (3) the accusatory, or non-accusatory, nature of the questioning; (4) the amount of restraint on the individual's physical movement; and (5) statements made by officers regarding the individual's freedom to move or leave. *United States v. Wright*, 777 F.3d 769, 775 (5th Cir. 2015). Custody for *Miranda* purposes requires a greater restraint on freedom than seizure under the Fourth Amendment. *Bengivenga*, 845 F.2d at 598. It is well-established that ordinary traffic stops do not place a person "in custody" for purposes of *Miranda*. *Berkemer v. McCarty*, 468 U.S. 420, 437-39 (1984) (finding brevity, spontaneity, and public nature of normal traffic stop, and small number of officers involved, renders stop non-custodial).

We conclude that Coleman was not "in custody" for purposes of *Miranda* when he made any of the challenged statements. Up to the time he was actually arrested on the unrelated warrant at the end of the stop, the surrounding circumstances and degree of restraint never meaningfully advanced beyond what is typical during an ordinary traffic stop. *See id.* The stop was conducted on the side of a public roadway, where a traffic stop is normally conducted; Rosamond never engaged Coleman in specific, lengthy or accusatory questioning about any suspected offense; and Coleman was either sitting in his car or standing outside it, unrestrained, during the entire stop. *See id.*; *Wright*, 777 F.3d at 775 (discussing these as factors to be considered). While the 30-minute stop was arguably somewhat longer than a typical traffic stop, the length was extended primarily because reasonable suspicion had arisen regarding a different offense—Rosamond was waiting for confirmation

on the unrelated warrant—and because Coleman consented to a search, not because of any extended questioning.

Because the stop was non-custodial, *Miranda* warnings were not required. The district court did not err when it denied the motion in limine/motion to suppress or the motion for a new trial.

### B.     Sufficiency of the Evidence (Hare and Coleman)

Coleman and Hare preserved these objections by moving for acquittal; we thus review the sufficiency of the evidence de novo. *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012). We view all evidence in the light most favorable to the jury's verdict and "determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quotation omitted).

To support a drug conspiracy conviction, the government must establish "(1) the existence of an agreement between two or more persons to violate narcotics law; (2) the defendant's knowledge of the agreement; and (3) the defendant's voluntary participation in the agreement." *United States v. Gonzalez*, 76 F.3d 1339, 1346 (5th Cir. 1996). "A jury may infer the elements of a conspiracy conviction from circumstantial evidence: An agreement to violate narcotics laws may be inferred from concert of action. Knowledge of the conspiracy may be inferred from a collection of circumstances." *United States v. Leal*, 74 F.3d 600, 606 (5th Cir. 1996) (quotations and citations omitted). Even uncorroborated accomplice testimony may be sufficient to support a conviction, if it is not "incredible or otherwise unsubstantial on its face." *United States v. Morales*, 477 F.2d 1309, 1312 (5th Cir. 1973) (quoting *Tillery v. United States*, 411 F.2d 644, 647 (5th Cir. 1969)).

#### 1.     Coleman

Coleman challenges the credibility of the testimony of co-defendant Kimberly Brown. Brown's testimony was the primary evidence tying Coleman

No. 14-40406

to the conspiracy. The other co-defendants testified that they did not know Coleman. However, Brown testified that she, Hare, and Coleman took two trips to Louisville, Kentucky, selling 10 kilograms of cocaine each time. She testified about how the three transported the cocaine and the money, that they all stayed at the Galt House Hotel, how they conducted drug transactions in the hotel, and how they transported the money back to Dallas. Additional evidence corroborated Brown's testimony. Records from the hotel confirmed Coleman was registered for a night in April 2011, and that both Coleman and Brown were registered May 11 through May 13, 2011. Telephone records showed 104 calls between Hare's phone and Coleman's phone between May 11 and May 13, 2011. Officers observed Brown's car and Coleman's car traveling together on the route back from Kentucky. Further, during the traffic stops, officers found $111,000 cash in Brown's car and $186,000 in cash in Coleman's car, which aligned with the testimony that 10 kilograms of cocaine sold for approximately $300,000.

This evidence was sufficient for the jury to find that Coleman agreed to participate in a conspiracy to distribute at least 5 kilograms of cocaine. The jury was properly instructed about accomplice testimony, and the jury was informed that Brown had pleaded guilty and was cooperating with the hope of a reduced sentence. The jury found Brown's testimony to be credible, and other evidence corroborated her testimony. There is no basis to overturn the jury's verdict.

2.     Hare

Hare likewise challenges the sufficiency of the evidence by attacking the credibility of the co-defendants, arguing that they had every incentive to lie and attribute the drug trafficking to him. Four separate individuals testified that Hare sold substantial amounts of cocaine and marijuana, possessed substantial amounts of cocaine and marijuana, and directed their trafficking

of cocaine and marijuana, over multiple years and in multiple states. Keith testified that between 2004 and 2010, he bought 50 pounds a week of marijuana from Hare, for a total of 4,000 pounds, and from 2007 to 2010, bought between 20 and 50 kilograms of cocaine from Hare. Williams testified that the marijuana, cocaine, packaging materials, and money found in her house were Hare's, and that Hare regularly used her houses to store large amounts of marijuana, cocaine and money. Brown testified that she and Hare traveled to Kentucky four times to sell marijuana and cocaine, totaling 400 pounds of marijuana and 30 kilograms of cocaine. Hall testified that she transported marijuana from Dallas to Oklahoma at Hare's direction multiple times, and that she transported a total of 250 pounds of marijuana for Hare. Other evidence corroborated the testimony of the witnesses and co-defendants, including surveillance and the money, packaging materials and weapons found during the various searches of the co-defendants' houses and other locations involved in the conspiracy

This evidence was sufficient for the jury to find that Hare agreed to participate in a conspiracy to distribute at least 1,000 kilograms of marijuana and 5 kilograms of cocaine. Again, the jury was properly instructed about accomplice testimony and was informed about the pleas of the co-defendants and that they were testifying with the hope of a reduced sentence. The jury found the testimony credible. There is no basis to overturn the jury's verdict.

C.    *Drug Weight (Hare)*

Hare next argues that the district court erred in its determination of the drug weight attributable to him at sentencing. The pre-sentence report ("PSR") concluded that Hare was responsible for 5,022 kilograms of marijuana and 180 kilograms of cocaine (equivalent to 36,000 kilograms of marijuana pursuant to U.S.S.G. § 2D1.1 cmt. n. 8), for a total of the equivalent of 41,022 kilograms of marijuana. Under the 2013 Sentencing Guidelines, this drug

weight resulted in a base offense level of 38.  U.S.S.G. § 2D1.1(c)(1).  After other enhancements and reductions not at issue on appeal, Hare's final offense level was 42.  Together with criminal history category II, Hare's Guidelines range was 360 months to life.  The district court sentenced him to life.

A district court's determination of the quantity of drugs for which a defendant is responsible is a factual finding reviewed for clear error.  *See United States v. Cooper*, 274 F.3d 230, 238 (5th Cir. 2001).  The drug weight includes the drugs for which the defendant is directly responsible and the drugs that can be attributed to him in a conspiracy.  *See* U.S.S.G. § 1B1.3(a)(1).  For conspiratorial conduct to be attributed to a defendant, the co-conspirator's conduct must be "reasonably foreseeable" to the defendant and within the scope of the defendant's agreement.  *United States v. Carreon*, 11 F.3d 1225, 1230 (5th Cir. 1994).  In determining drug weight to calculate the offense level under the Guidelines, the court may rely on statements and testimony from codefendants to calculate an amount higher than the jury's verdict, provided the information bears the minimum indicia of reliability.  *See United States v. Cantu-Ramirez*, 669 F.3d 619, 628-29 (5th Cir. 2012).

On appeal, Hare argues that he should only be held responsible for 2,294 kilograms of marijuana, based on the marijuana that was actually seized from Williams' house and Hall's vehicle, and converting the currency actually seized from the various searches to its cocaine equivalent.  This barely-briefed argument clearly fails under the standards described above.  The district court held Hare accountable for the amount of cocaine and marijuana that was supported by statements and trial testimony from Keith, Williams, Brown, and Hall, whom it found to be credible, and the amounts of drugs and money found during searches and traffic stops of Hare and the other co-defendants.  Other than again challenging the credibility of the co-defendants, Hare offers no argument undermining or rebutting any of the drug weights contained in the

No. 14-40406

PSR or testified to by the co-defendants at trial.  Thus, we find no error in the district court's drug weight calculation.

    D.    *Eighth Amendment (Hare)*

    Hare argues that his life sentence for drug trafficking is disproportionate and constitutes a violation of the Eighth Amendment.  Because he raises this argument for the first time on appeal, we review for plain error.  *United States v. Helm*, 502 F.3d 366, 367 (5th Cir. 2007).

    The Eighth Amendment prohibits sentences that are grossly disproportionate to the crime.  *See United States v. Thomas*, 627 F.3d 146, 160 (5th Cir. 2010).  "On review, however, this court does not 'substitute its judgment for that of the legislature nor of the sentencing court as to the appropriateness of a particular sentence; it should decide only if the sentence is within the constitutional limitations.'"  *Id.* (quoting *United States v. Harris*, 566 F.3d 422, 436 (5th Cir. 2009).  To do so, we first make a threshold comparison of the gravity of the offense to the severity of the sentence.  *Id.*  If this review convinces us that the sentence is "grossly disproportionate to the offense," we then compare the defendant's sentence to sentences for similar crimes in this and other jurisdictions.  *Id.*  Our "review of Eighth Amendment challenges is narrow," and "successful Eighth Amendment challenges to prison-term lengths will be rare."  *Id.*

    Hare's Eighth Amendment argument is conclusory, nonspecific and unpersuasive.[3]  He merely states that the life sentence is disproportionate to

---

    [3] We have noticed that the Eighth Amendment argument in Hare's brief is copied and pasted essentially word-for-word from briefs by the attorney, J. Warren St. John, in numerous other cases before this court, with little to no change made to account for the specific case being briefed.  In fact, Mr. St. John apparently forgot to substitute Hare's own name into the argument copied from a brief for another defendant, as the final line of this section of his brief refers to "Appellant Forester."  Arguments that are not appropriately tailored to each individual client and the facts of each case not only do the client a grave disservice, but they also undermine the principle of judicial economy.

the seriousness of the offense, and that the sentence "makes no measurable contribution to acceptable goals of punishment." He makes no comparison of his sentence to sentences for similar crimes in this or other jurisdictions. We will not consider an issue that is inadequately briefed. *See, e.g., Dardar v. Lafourche Realty Co.*, 985 F.2d 824, 831 (5th Cir. 1993) ("Questions posed for appellate review but inadequately briefed are considered abandoned."). Because Hare does not even attempt to make an argument according to the well-settled method of determining whether a sentence is unconstitutionally disproportionate, we deem this issue abandoned. *See id.*

### III.  Conclusion

For the foregoing reasons, we AFFIRM Hare's and Coleman's convictions and sentences in all respects.