# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
July 26, 2019

Lyle W. Cayce
Clerk

No. 18-30741

UNITED STATES OF AMERICA,

> Plaintiff - Appellee

v.

WALTER GLENN,

> Defendant - Appellant

Appeal from the United States District Court
for the Middle District of Louisiana

Before BARKSDALE, SOUTHWICK, and HAYNES, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

A jury found Walter Glenn guilty of conspiracy, access device fraud, and identity theft for his role in a fraudulent check-cashing scheme. The district court denied two motions to suppress evidence taken from a rental car that Glenn was driving. Glenn contends the district court erred by admitting the evidence. He also challenges his sentence. We AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

In September 2014, Walter Glenn, Larry Walker and Thomas James were in a rental car, traveling through Louisiana on Interstate 10. Glenn was driving. Sergeant Donald Dawsey of the West Baton Rouge Parish Sheriff's

No. 18-30741

office stopped them for what he believed was a traffic violation. Dawsey walked to the vehicle and had Glenn give him his driver's license and insurance verification. Dawsey immediately noticed a set of screwdrivers in the door of the vehicle. The officer then had Glenn get out and go to the rear of the car. There, Dawsey pointed to the license plate, which was obscured with a tinted plastic cover and said the cover was the violation that caused the stop. Dawsey, who had two decades of experience with the sheriff's office at the time, later explained at a hearing that motorists often use such license plate covers to evade identification by traffic cameras. Glenn stated the cover was affixed to the license plate at the time of the rental and repeatedly offered to remove it.

At the back of the car, Glenn explained that Walker had rented the vehicle. After questioning Glenn, Dawsey spoke with Walker and got the rental agreement, then returned to Glenn at the rear of the car for further questioning. Dawsey then told Glenn to stay behind the rental car while Dawsey returned to his cruiser to verify some of the information he had just received. By this point, about six and half minutes had passed since Glenn drove the vehicle onto the shoulder of the interstate and stopped.

When Dawsey returned to his cruiser, he did not in fact input the information; instead he called for assistance. Several minutes later, Dawsey returned to question Glenn further, eventually asking if he could search the car. Glenn responded, "Yeah. You can search it." Dawsey told Walker that Glenn had consented to a search, to which Walker replied, "he said you can search it, search it." Walker and James stepped to the rear of the car, and Dawsey and other officers searched the car. They found, among other things, over 100 blank ID cards, dozens of blank checks, holographic overlays, a printer, envelopes with names and social security numbers, computer equipment, and $95,000.

2

No. 18-30741

The subsequent investigation revealed that Glenn, Walker, and James were involved in a multi-state counterfeit check scheme and had been in Texas to cash counterfeit checks. The Government charged them with conspiracy to make and pass counterfeit checks, produce fraudulent IDs, and use unauthorized access devices (*i.e.*, social security numbers). It also charged them with access device fraud and aggravated identity theft.

In 2016, all three filed suppression motions challenging the legality of the stop and the search of the entire vehicle. The district court denied Glenn's and James' motions and partially denied Walker's, holding: the stop was lawful; the officer had reasonable suspicion for extending the stop; and, Glenn and James lacked standing to challenge the search of the vehicle. In partially granting Walker's motion, the court ruled his consent to the search was not voluntary. The Government appealed. We affirmed the district court's partial grant of Walker's motion to suppress, and the Government dismissed his charges. *See United States v. Walker*, 706 F. App'x 152, 154-56 (5th Cir. 2017).

James and Glenn's cases were held in abeyance during the pendency of the interlocutory appeal concerning Walker. Following our opinion in *Walker*, Glenn and James filed a second joint suppression motion primarily regarding their personal items found in bags and luggage within the car. The district court again refused to suppress any evidence as to Glenn, concluding Glenn gave valid consent to the search. The court granted James' motion to suppress items found in his personal bag, and James later pled guilty to all counts. Only Glenn went to trial where the jury found him guilty of all charges. The district court sentenced him to 120 months in prison.

On appeal, Glenn challenges the district court's denials of his motions to suppress and several sentencing decisions.

3

No. 18-30741

DISCUSSION

## I.  *Suppression issues*

"On appeal of the denial of a motion to suppress, this court reviews the district court's fact findings for clear error and its legal conclusions *de novo*." *United States v. Rounds*, 749 F.3d 326, 337 (5th Cir. 2014).  We view "the evidence in the light most favorable to the government as the prevailing party." *Id.* at 338.

As he did in district court, on appeal Glenn contends all the evidence seized from the rental vehicle should have been suppressed.[1]  He does not renew as an independent argument his specific challenge to the search of his personal bag in the trunk.  Three envelopes of cash were found in that bag. His primary appellate argument is that Dawsey improperly obtained his consent to search.  We review fact-findings as to the voluntariness of consent to search for clear error.  *See United States v. Shabazz*, 993 F.2d 431, 438 (5th Cir. 1993).  If consent followed a violation of the Fourth Amendment, that consent must also be "an independent act of free will."  *United States v. Jenson*, 462 F.3d 399, 406 (5th Cir. 2006).  Glenn argues this additional requirement applies here because Dawsey detained him for an unreasonable time on the side of I-10.

### A.     *Standing to challenge the search of the car*

Whether Glenn has standing to challenge the search of the entire car is unclear.  At the time the district court denied Glenn's motions to suppress,

---

[1] In Walker's appeal, we held that Louisiana law does not prohibit tinted covers on license plates.  *See Walker*, 706 F. App'x at 154 n.1.  Relatedly, Glenn argues in his reply brief that Dawsey violated the Fourth Amendment because the stop never should have occurred. He did not present this argument in his opening brief, however, and thereby waived it.  *See United States v. Scroggins*, 599 F.3d 433, 447 n.8 (5th Cir. 2010).

4

Fifth Circuit precedent provided that a driver of a rental vehicle who was not authorized under the rental agreement did not have a reasonable expectation of privacy in the vehicle; such a driver thus lacked standing to contest its search. *See United States v. Riazco*, 91 F.3d 752, 754 (5th Cir. 1996). Glenn contends we should hold he has standing under the recent Supreme Court opinion in *Byrd v. United States*, 138 S. Ct. 1518, 1524 (2018). Because we consider the issue a close one, and an absence of standing is not a jurisdictional defect in this context, *id.* at 1530, we decline to analyze the issue today in light of our resolution of the merits of Glenn's Fourth Amendment claim.

### B.     Reasonable suspicion to extend the stop

An officer can extend a stop only "as long as is reasonably necessary to effectuate the purpose of the stop." *United States v. Villafranco-Elizondo*, 897 F.3d 635, 641 (5th Cir. 2018) (citation omitted). Thus, an officer has the time needed to issue a traffic citation, examine the driver's license, insurance, and registration, and ascertain if there are outstanding warrants. *Rodriguez v. United States*, 135 S. Ct. 1609, 1614-15 (2015). An officer's inquiries must be limited to the time in which the "tasks tied to the traffic infraction are — or reasonably should have been — completed." *Id.* at 1614.

Extending the stop beyond what is needed for the initially relevant tasks is proper if "an officer develops reasonable suspicion of another crime" during that time, allowing the officer to "prolong the suspect's detention until he has dispelled that newly-formed suspicion." *Villafranco-Elizondo*, 897 F.3d at 642. A reasonable suspicion is one that has "a particularized and objective basis for suspecting the person stopped of criminal activity;" it is "more than an inchoate and unparticularized suspicion or hunch." *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002) (citations and quotation marks omitted). Of principal relevance in the totality of circumstances that an officer is to consider "will be

the events which occurred leading up to the . . . search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion." *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

The Government concedes that the initial purposes of the traffic stop were complete when Dawsey went to his cruiser to request assistance from other officers. The Government identifies numerous facts to support that, before that point, Dawsey gained reasonable suspicion that Glenn and his co-defendants were involved in criminal activity: (1) they were in a rental vehicle, and such vehicles are often used for drug-trafficking; (2) they were driving on I-10, which is known for drug-trafficking; (3) the rental vehicle had a tinted license-plate cover, which Dawsey had never seen in his 20 years as a police officer; (4) Dawsey immediately noticed a set of screwdrivers in the door of the vehicle, which could have been used to affix the license-plate cover; (5) Glenn was very anxious to remove the license-plate cover; (6) Glenn and Walker both mispronounced Beaumont, where they had allegedly been staying with family for the weekend; (7) their purported itinerary was "implausible" in Dawsey's opinion; (8) Glenn and Walker provided inconsistent information regarding Walker's residence and mode of transportation to Connecticut; and (9) the interior of the vehicle looked "lived in," which, in Dawsey's view, was inconsistent with Glenn's story of staying with family for the weekend.

The district court did not state that all of these circumstances were relevant, but it did conclude that reasonable suspicion arose for extending the stop because these individuals were traveling in a rental vehicle on a known drug-trafficking corridor having a tinted cover over the license-plate with screwdrivers likely used to affix the cover. There was no error when, after considering the totality of the circumstances, the district court held that Dawsey had reasonable suspicion of illegal activity to extend the stop.

No. 18-30741

C.    *Glenn's consent to search*

The Government must prove Glenn voluntarily consented to the search by a preponderance of the evidence. *Rounds*, 749 F.3d at 338. We use the following test to determine voluntariness:

(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*Jenson*, 462 F.3d at 406 (citation omitted). The district court found that some factors favored Glenn, but that there were no coercive police procedures, Glenn was cooperative, and Glenn appeared to be intelligent and well-educated. The District Court concluded that Glenn had voluntarily consented.

We find no clear error in this finding and thus no error in admitting the evidence from the search of the car.

II.    *Sentencing*

At sentencing, the district court determined Glenn was responsible for an intended loss amount of over $2 million and applied a 16-level increase to his offense level. The district court also applied enhancements for a leadership role and obstruction of justice. Glenn argues these increases were erroneous. In examining these claims of error, we review the district court's factual findings for clear error and its interpretation or application of the Guidelines *de novo*. *See United States v. Scott*, 654 F.3d 552, 555 (5th Cir. 2011).

The loss amount and the two enhancements are factual findings. *See United States v. Simpson*, 741 F.3d 539, 556 (5th Cir. 2014) (loss amount); *United States v. Gomez*, 905 F.3d 347, 351 (5th Cir. 2018) (leadership role); *United States v. Infante*, 404 F.3d 376, 393 (5th Cir. 2005) (obstruction of justice). The district court's findings require a preponderance of the evidence.

7

*Simpson*, 741 F.3d at 556.   Under clear error review, we will affirm if the findings are "plausible in light of the record as a whole."  *Id.* at 556-57.


### A.    Loss calculation

The Guidelines instructed the district court to increase Glenn's offense level in relation to the amount of loss involved.  *See* U.S.S.G. § 2B1.1.  The district court attributed losses to Glenn in excess of $2 million, which triggered a 16-level increase.  *Id.* § 2B1.1(b)(1)(I).  Glenn argues the loss amount should only be in the $95,000-$150,000 range, which triggers an 8-level increase.  *Id.* § 2B1.1(b)(1)(E).

The sentencing court looks to the greater of the actual or intended loss and "all criminal acts that were 'part of the same course of conduct or common scheme or plan as the offense of conviction,' including acts beyond the specific offenses of conviction." *United States v. Dickerson*, 909 F.3d 118, 128 (5th Cir. 2018) (quoting U.S.S.G. § 1B1.3(a)(2) (2013)).  The loss amount also accounts for the "reasonably foreseeable" acts of others "within the scope of" and "in furtherance of" the joint criminal activity.  § 1B1.3(a)(1)(B); *see also United States v. Mauskar*, 557 F.3d 219, 233 (5th Cir. 2009).  Further, the sentencing court "need only make a reasonable estimate of the loss."  U.S.S.G. § 2B1.1 cmt.3(C).

The investigation after Glenn's arrest revealed that the "Texas trip" was part of a larger conspiracy of check-cashing fraud at Walmart stores.  The fraud investigations department of Walmart's check processor reviewed its records and determined 524 counterfeit check cashing attempts in 2014 and 309 in 2015 at Walmarts across 20 states were related.  The total amount cashed or attempted to have been cashed in these transactions was over $2 million.  Glenn's argument is that only the losses associated with the Texas trip should be attributed to him.  He does not argue the 833 transactions are improperly

linked to the conspiracy of which he admits being a part. Instead, he argues there are insufficient facts supporting his involvement before and after the Texas trip.

Found in the rental car was a thumb drive that contained Social Security and bank account numbers related to the 2014 check-cashing attempts. Additionally, the thumb drive contained multiple fake IDs with James's photo and a guide to fake IDs. The district court noted "there has been nothing presented to tie that flash drive . . . to anyone other than" Glenn given he had personal documents also stored on the device. Although not cited by the district court in its loss amount determination, the plausible finding that Glenn filled a leadership role — discussed below — suggests he was a central part of the conspiracy and not simply a limited participant in the Texas trip. Further, Glenn does not have to be directly involved with all the activities of the conspiracy. The district court only needs to make a "reasonable estimate" of the actual and intended loss associated with all reasonably foreseeable conduct within the conspiracy, including the acts of Glenn's associates. It was plausible for the district court to link Glenn with loss amounts of the Walmart fraud across 2014 and 2015.

### B.    *Leadership role enhancement*

Sentencing Guidelines Section 3B1.1(a) increases the offense level by four "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." The sentencing court looks to

> the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the

offense, the nature and scope of the illegal activity, and the degree
of control and authority exercised over others.

*Id.* § 3B1.1 cmt. n.4.  The district court is permitted to draw inferences from the evidence. *United States v. Murray*, 648 F.3d 251, 257 (5th Cir. 2011).

The district court considered (1) Glenn's lack of interaction with third parties, such as when members of the conspiracy rented a car and cashed checks, which indicated he "acted in the traditional role of an organizer . . . because he did not want . . . to be depicted on any video surveillance systems;" (2) Glenn's claim to the money found in the rental car, which suggested he controlled the finances; (3) a statement James gave that Glenn took the largest share of proceeds in the Texas trip offenses and was the "orchestrator" of the conspiracy; and (4) the fact that raw data used to accomplish fraud was stored on the thumb drive and a laptop that were personally connected only to Glenn.

Lastly, the district court considered two participants in other instances of fraud related to the conspiracy who, when added to Glenn, Walker, and James, supported finding an involvement of at least five people.  One of these individuals was captured on Walmart security cameras sometimes accompanying James during attempts to cash fraudulent checks.  The other person was with James and Walker when they were pulled over in Massachusetts in January 2014.  She had a fake ID in the name of Dominique Maddox, and the state trooper discovered in the car rented by Walker a check made payable to Dominque Maddox by a Liberty Tax Service.  Around this same time in Massachusetts, there were fraudulent attempts to cash Liberty Tax Service checks at Walmarts, and these instances were later linked to data on Glenn's thumb drive.

This evidence is sufficient to make the inference Glenn exercised such a leadership role plausible and not clearly erroneous.

No. 18-30741

C.　　*Obstruction of justice enhancement*

Sentencing Guidelines Section 3C1.1 increases an offense level by two if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice." This includes "providing materially false information to a judge or magistrate judge." *Id.* cmt n.4(F). Glenn was released from detention before trial and told he needed permission from Pretrial Services to travel outside of the Middle District of Louisiana. Glenn traveled to Florida twice as well as to Los Angeles and Las Vegas without such permission. The Government then sought a revocation of his release.

Glenn stated at the revocation hearing that he had not requested permission to take either Florida trip. It is unclear, though, whether he actually did request permission to take the first trip as he seemed confused at the hearing. He also stated he did not know of the need to report the second Florida trip and that he forgot the need to report travel to Los Angeles and Las Vegas. The magistrate judge did not accept that Glenn was unaware of his need to get permission to travel, a finding based in part on the fact Glenn at least once contacted the pretrial services office seeking an explanation of his travel obligations.

Despite some possible confusion, it is clear Glenn did not request permission for the second Florida trip nor the Los Angeles and Las Vegas trip. It is also clear that, regarding the second Florida trip, Glenn said "I didn't know at the time that I had to report it," and regarding the Los Angeles and Las Vegas trip, he stated he "forgot [the] requirement" to report it. The magistrate judge at the bail hearing found these to be untruthful statements and that Glenn had demonstrated he knew of the need to request permission to travel. It was not error for the district court to apply the obstruction enhancement.

AFFIRMED.

11