# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-10291

United States Court of Appeals
Fifth Circuit

**FILED**
June 5, 2020

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

MAYRA YURIVIA REYES, also known as Mayra Bautista-Hernandez,

Defendant–Appellant.

Appeal from the United States District Court
for the Northern District of Texas

Before SMITH, GRAVES, and HO, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Mayra Reyes pleaded guilty of conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine ("meth") in violation of 21 U.S.C. § 846. Her plea agreement reserved the right to appeal her motion to suppress. Because the officer who pulled Reyes over had reasonable suspicion to extend the stop for a canine sniff, and because Reyes was not entitled to *Miranda* safeguards during the routine traffic stop, we affirm.

No. 19-10291

I.

Officer Will Windham stopped Reyes, approached her car, informed her that she was speeding, and requested her driver's license and registration. Reyes volunteered that she was trying to get her kids to school. Windham found that odd because there were no passengers. He asked where the kids were, and Reyes responded that they were in Abilene—fifteen miles ahead.

Windham asked Reyes to accompany him to his patrol car while he looked up her information. According to Windham, she was "extremely hesitant" to leave the truck. After she refused, he explained that he completes traffic stops in his patrol car for safety purposes—to avoid being hit by passing vehicles and because he doesn't know what may be inside the driver's vehicle. Additionally, it was very cold. Windham found Reyes's persistent reluctance to exit her truck unusual.[1]

As she pondered exiting her vehicle, Reyes asked, "What about the truck"? Windham answered that it could stay parked where it was. As Reyes sat down in the passenger seat of the patrol car, she locked her truck. Windham—who had never seen anyone lock his or her vehicle during a traffic stop—suspected that Reyes was trying to hide something illegal.

Windham asked Reyes where she was heading, and she mumbled, "this address," as she scrolled through her phone to find it. He inquired, "I thought you said you were taking the kids to school." She responded, "Yeah. Not my kids. My kids [are] in Grand Prairie. I'm helping a friend take her kids to school. She doesn't have a car or anything." Confirming that Reyes started her trip in Grand Prairie, Windham asked, in a surprised tone, "What time did

---

[1] He testified: "I've stopped a lot of cars, and over—get everybody out—usually everybody out of the vehicle, and I've never had nobody refuse to come out of the vehicle like the way she did not want to come out."

you leave?" She replied, "About, what, three hours ago, or so?" Windham, shocked that she purported to travel three hours to take kids to school, "could tell something was not right."

Windham asked Reyes who owned the truck, which had a temporary Oklahoma tag. She replied that it was her ex-husband's. Based on his training, education, and experience, Windham surmised that narcotics couriers often use vehicles registered to others to avoid forfeiture.

As Reyes showed Windham the truck's documents, he asked whether she had ever been arrested. She stated that she had an arrest for DWI. Soon after, and while continuing to examine the truck's documents, Windham asked whether there was anything illegal in the truck. Reyes's facial expressions changed dramatically, and her eyes shifted from Windham to the front windshield as she shook her head and said, "No, no, no. There shouldn't be. I mean, it's brand new. It's brand new."

Sounding skeptical, Windham asked again, "So you drove all the way from Dallas, or Grand Prairie, to take these kids to school for this lady?" Reyes then added, "Not just for that. I wanted to see her." She then explained that she previously had a relationship with the woman in prison and that the woman's husband "was going to be at work." Windham told Reyes that she wasn't going to make it in time to take the kids to school. She then changed her story yet again, claiming that she was going to Abilene "just to see her, to be honest."

After typing into the computer some more, Windham asked for consent to search the truck. Reyes responded that she could not give consent because it was not her truck. He explained that she could grant consent because she had control of the truck. She refused.

3

No. 19-10291

At that point—roughly eight-and-a-half minutes into the stop—Windham informed Reyes that he was going to call a canine unit to perform a free-air sniff. He said that if the dog detected drugs, he would have probable cause to search inside. He requested a canine unit, then told Reyes that he was going to check the truck's vehicle identification number ("VIN") to see whether it matched the paperwork, because he was "not getting a good return" on the license plate.

Windham noted that Reyes had several items on her and asked whether she had any weapons. She emptied her pockets, which contained only a wallet and a pack of cigarettes. She asked whether she could have a cigarette, and Windham agreed to let her "stand outside and smoke" while he got the VIN. Reyes got out of the car for about thirty seconds, without smoking. After re-entering the car, she told Windham that she didn't have her lighter on her. He asked if she had one in the truck, and she responded that she did not know and mumbled that she had "probably dropped it." Windham found it odd that Reyes declined to retrieve her lighter. He testified that he had never had a smoker turn down his offer to let him or her smoke.

After Windham received Reyes's criminal background check, he asked her whether she had any other prior arrests. She said that, in addition to the DWI, she had been arrested for warrants related to tickets. Windham prodded further, and Reyes conceded that she had been arrested for a pill that was found in her ex-girlfriend's vehicle. That story evolved, however, and Reyes admitted that she was arrested for a meth offense. She said that she went to jail for that offense and later explained—her story shifting yet again—that the woman she was going to visit was her girlfriend in prison.

Within a few minutes, a canine unit arrived and conducted the sniff. The

4

No. 19-10291

dog alerted officers that there was a controlled substance in the truck. Windham searched inside and found 127.5 grams of meth and a loaded handgun.

A grand jury indicted Reyes on various counts. She moved to suppress evidence from the stop. She contended, first, that Windham did not have reasonable suspicion to extend the stop for the canine sniff. And, second, she contended that she was entitled to *Miranda* warnings when Windham directed her into his patrol car.

After a hearing, the court held that "Windham had a reasonable suspicion to extend the traffic stop until a narcotics detection K-9 unit could arrive." Additionally, the court ruled that Reyes was not in custody for *Miranda* purposes, so her statements were not suppressed.

Reyes pleaded guilty of conspiracy to distribute and possess with intent to distribute 50 grams or more of meth in violation of 21 U.S.C. § 846 but reserved her right to appeal the denial of the motion to suppress. She was sentenced and appeals the denial of her motion to suppress.

## II.

"On appeal of the denial of a motion to suppress, this court reviews the district court's fact findings for clear error and its legal conclusions *de novo*." *United States v. Rounds*, 749 F.3d 326, 337 (5th Cir. 2014). "[W]e review the evidence in the light most favorable to the government as the prevailing party." *Id.* at 338. The ruling "should be upheld if there is any reasonable view of the evidence to support it." *United States v. Massi*, 761 F.3d 512, 520 (5th Cir. 2014) (quotation marks omitted).

## III.

Reyes makes two assertions concerning whether Windham unlawfully extended the stop. First, she contends that "Windham lacked reasonable

suspicion to detain her beyond the time reasonably necessary to conduct an investigation of the traffic violation, which was the purpose for the stop." Second, she avers that "even if Officer Windham did eventually gain reasonable suspicion to afford him the ability to prolong the stop, he did not gain reasonable suspicion until after he had already detained Reyes beyond the time reasonably necessary to conduct the traffic stop." Because Windham had reasonable suspicion to extend the stop before he called for a canine sniff, both of Reyes's theories fail.

### A.

The protection of the Fourth Amendment "extends to vehicle stops and temporary detainment of a vehicle's occupants." *United States v. Andres*, 703 F.3d 828, 832 (5th Cir. 2013). After lawfully stopping a driver for a traffic violation, an officer's actions must be "reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place." *Id.* The stop may last no longer than necessary to address the traffic violation, and constitutional authority for the seizure "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). Those tasks include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355.

Officers may ask questions unrelated to the purpose of the stop while waiting for computer checks to process. *United States v. Pack*, 612 F.3d 341, 350 (5th Cir.), *modified on other grounds*, 622 F.3d 383 (5th Cir. 2010). But officers must diligently pursue the investigation of the traffic violation. *Rodriguez*, 575 U.S. at 354. The Fourth Amendment tolerates additional investigation unrelated to the safe and responsible operation of the vehicle only if that

No. 19-10291

investigation does not lengthen the driver's detention or is supported by reasonable suspicion of additional criminal activity. *Id.* at 354–55. If the officer develops reasonable suspicion of such activity "in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." *United States v. Banuelos-Romero*, 597 F.3d 763, 767 (5th Cir. 2010).

"[A] mere 'hunch' does not create reasonable suspicion." *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020). The "officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). We look at "the totality of the circumstances" in determining whether an officer had a particularized and objective basis for suspecting criminal activity. *Glover*, 140 S. Ct. at 1191. That analysis "is necessarily fact-specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion." *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999). "Of principal relevance in the totality of circumstances that an officer is to consider will be the events which occurred leading up to the . . . search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion." *United States v. Glenn*, 931 F.3d 424, 429 (5th Cir.) (quotation marks omitted), *cert. denied*, 140 S. Ct. 563 (2019).

## B.

Reyes advances two arguments regarding whether Windham unlawfully extended the traffic stop. First, she contends that the facts on which Windham relied do not amount to reasonable suspicion. Second, she avers that even if Windham gained reasonable suspicion to prolong the stop, he did not do so

within the time reasonably necessary to conduct the stop.[2]  The earliest time that Reyes says the stop should have been completed was when Windham called for the canine unit.  Because Windham had reasonable suspicion to extend the stop by then, Reyes's arguments can be consolidated.

The government provides several specific and articulable facts to support Windham's suspicion:

- Windham knew that I-20—where Reyes was pulled over—is a known drug-trafficking corridor, and Dallas/Fort Worth—whence she came—is a known source for narcotics.[3]

- Reyes drove a truck registered in someone else's name, with a temporary plate for a different state.  In Windham's experience, couriers often drive vehicles registered to other people to avoid forfeiture.[4]

- Throughout the stop, Reyes took unusual measures to protect the truck.  She initially refused to exit it.  And when she did, she locked it, even though an officer was immediately behind it in a marked patrol vehicle.

- Reyes offered inconsistent and implausible stories about the purpose of her travel—for instance, stating that she had driven three hours to take kids to school, even though there were no passengers.[5]

---

[2] Reyes's second argument contains two sub-arguments, based on whether the stop should have been completed when Windham called for the canine, or two minutes later, when he completed the VIN check.

[3] *See United States v. Smith*, 952 F.3d 642, 650 (5th Cir. 2020) ("[T]o the extent Smith argues we cannot consider his presence on I-55, he is incorrect.  Smith's travel on I-55 supports reasonable suspicion on these facts."); *Glenn*, 931 F.3d at 429 (considering that the defendants "were driving on I-10, which is known for drug-trafficking," as a factor contributing to reasonable suspicion); *Pack*, 612 F.3d at 361 (stating that the defendant and his girlfriend "were traveling along a drug trafficking corridor"—I-10—was a factor supporting reasonable suspicion); *United States v. Castelo*, 415 F.3d 407, 412 (5th Cir. 2005) (stating that the defendant had stopped in El Paso, "a known 'source city' for illegal drugs," contributed to probable cause).

[4] *See United States v. Vazquez*, 555 F.3d 923, 929 (10th Cir. 2009) (noting that the registration contributed to reasonable suspicion because it was not in the defendant's name).

[5] *See United States v. Berry*, 664 F. App'x 413, 419 (5th Cir. 2016) (per curiam) ("This

No. 19-10291

- Reyes had a conviction for possession of meth.[6]

- Reyes was unemployed, which Windham figured provided her a motive to participate in illegal activity.

- When Windham asked Reyes whether there was anything illegal in the truck—a "yes or no" question—her facial expressions changed dramatically, and she said, "There shouldn't be. It's brand new. It's brand new."

Additionally, Windham drew on his training, education, and experience in narcotics interdiction, and his familiarity with the area, to surmise from those facts his suspicion that Reyes was participating in a crime.[7] Those articulable facts—and, in particular, Reyes's implausible stories and protectiveness of the vehicle—combine to establish reasonable suspicion.

Reyes avers that "[e]very one of the observations of Officer Windham are either specifically disclaimed by caselaw as not rising to the level of reasonable suspicion, or are analogous to other facts the caselaw disclaims." Reyes's divide-and-conquer approach, however, ignores "the Supreme Court's admonition not to treat each factor in isolation, but rather to give due regard to the totality of the circumstances." *United States v. Lopez-Moreno*, 420 F.3d 420, 433 (5th Cir. 2005). Although Reyes may have an innocent explanation for each of her actions—and some of them, such as that she came from the

---

Court has previously determined that inconsistent and untruthful statements can be a factor in developing reasonable suspicion during a traffic stop . . . .").

[6] *See Pack*, 612 F.3d at 361 (noting that the defendant's admission to prior arrests for theft and fighting as contributing to reasonable suspicion); *United States v. Gonzalez*, 328 F.3d 755, 758 (5th Cir. 2003) (listing prior arrest for drug trafficking as a factor supporting reasonable suspicion).

[7] *See Glover*, 140 S. Ct. at 1190 (recognizing "the significant role that specialized training and experience routinely play in law enforcement investigations"); *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc) (noting that the Supreme Court "has emphasized that courts must allow law enforcement 'officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person'" (quoting *Arvizu*, 534 U.S. at 273 (quotation marks omitted))).

No. 19-10291

Dallas/Fort Worth area, provide little support for reasonable suspicion—they together gave Windham much more than a mere "hunch" of illegal activity.

Reyes contends that two cases—*United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014), and *United States v. Spears*, 636 F. App'x 893, 901 (5th Cir. 2016)—support her argument that Windham unreasonably prolonged the stop. Neither does.

In *Hill*, 752 F.3d at 1038, this court ruled that officers lacked reasonable suspicion to order the defendant out of his car and frisk him. The defendant disputed the legality of the seizure from its inception. *Id.* at 1033. Reyes, by contrast, contends that Windham lacked reasonable suspicion to *extend* an otherwise lawful seizure. Additionally, in *Hill*, the government could offer only a few generalized facts to support the officers' suspicion.[8] Unlike the situation in that case, Windham had an extended, lawful interaction with Reyes and several articulable facts supporting his suspicion.

In *Spears*, 636 F. App'x at 895–96, officers conducting surveillance at the house of a suspected drug dealer saw Spears arrive and back into the driveway. After Spears left, he was pulled over for a traffic violation. *Id.* at 896. As the officer approached Spears's truck, the officer saw him rummaging in the center console. *Id.* Spears was nervous, evasive, and non-compliant. *Id.* Spears also stated that he was coming from visiting a relative, which the officer did not believe. *Id.* Spears refused the officer's request to exit the truck and be patted down. *Id.* A second officer arrived and asked Spears again. *Id.* He eventually relented. *Id.* After the pat-down, the officers instructed Spears to wait in the

---

[8] *See Hill*, 752 F.3d at 1033–34 (stating that officers based their purported suspicion on (1) the defendant's sitting in a parked car at an apartment complex known for drug activity, (2) a female passenger's exiting the car and walking toward the complex when a patrol car parked nearby, (3) the defendant's not having a driver's license on him, and (4) the complex's location in a county with a high crime rate).

back of the patrol car for a canine unit to arrive. *Id.* He protested again before complying. *Id.* While trying to find an available canine unit, the officers learned that the suspected drug dealer had been detained and possessed a large bag of money. *Id.* at 896–97. They then decided that they had probable cause to search Spears's truck, where they found a gun, a laundry bag that smelled of marihuana, and $59,800. *Id.* at 897. On those facts—and although it was "a close call," *id.* at 904 (Costa, J., concurring)—the court held that the officers lacked reasonable suspicion to detain Spears after the investigation of his traffic violation was complete. *Id.* at 901–02 (majority op.).

In addition to being unpublished and therefore non-precedential, *Spears* is different in several crucial ways. The court discounted Spears's purported lie—that he was coming from visiting a relative—because the officers didn't know the truth. *Id.* at 902. Here, Reyes admitted that she lied to Windham about taking kids to school. Moreover, the only evidence of Spears's nervousness was the officer's conclusory statement. *Id.* at 902–03. Reyes, on the other hand, refused to exit the truck and locked it when she got out, showing how nervous she was and how much she wanted to protect whatever was inside. There is also a video of her reaction to Windham's asking whether she had drugs in the car, which shows her smile turn quickly into a concerned daze. Finally, in *Spears*, the government offered only four generalized facts to support reasonable suspicion: The defendant allegedly lied about visiting a relative; he appeared nervous; he was evasive, non-compliant, and argumentative; and there was a backpack inside his vehicle (although that was not discovered until after the traffic stop had already been extended). *Id.* at 902–04. Here, by contrast, the government offers several specific facts in support of reasonable suspicion, as discussed above.

11

No. 19-10291

IV.

Reyes contends that she was entitled to *Miranda* warnings because "the circumstances and interactions of Reyes and Officer Windham would have [led] a reasonable person to believe they were under arrest." That argument falls flat, because a person detained in a routine traffic stop is not "in custody" for *Miranda* purposes.[9] *Miranda* applies only once "a suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer*, 468 U.S. at 440 (quotation marks omitted).

Reyes offers no persuasive reason why *Miranda* demands the suppression of her statements during a routine traffic stop. Windham directed her to his car in a friendly manner. He even encouraged her to bring her coffee with her and sit in the front seat. She was not patted down or restrained, and Windham allowed her to leave the car to smoke a cigarette. Because the traffic stop did not have the quality of a formal arrest, *Miranda* does not apply.

AFFIRMED.

---

[9] *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984); *see also United States v. Coleman*, 610 F. App'x 347, 353 (5th Cir. 2015) (per curiam) (holding that *Miranda* does not apply to statements made during a routine traffic stop).

No. 19-10291

JAMES E. GRAVES, JR., Circuit Judge, dissenting:

Our analysis of whether law enforcement has reasonable suspicion to extend a stop is "necessarily fact-specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion." *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999) (citation omitted). But a "mere 'hunch'" is insufficient. *Kansas v. Glover*, 140 S.Ct. 1183, 1187 (2020). Because we are bound by our precedent, I respectfully dissent.

The majority concludes that the trooper who detained Ms. Reyes gained reasonable suspicion to prolong the stop by the time he called the canine unit. In doing so, it credits several "specific and articulable facts" offered by the government, concluding that they combine to establish reasonable suspicion. I am mindful that the Supreme Court has admonished jurists "not to treat each factor in isolation, but rather to give due regard to the totality of the circumstances." *United States v. Lopez-Moreno*, 420 F.3d 420, 433 (5th Cir. 2005) (citing *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). "[F]actors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion." *Ibarra-Sanchez*, 199 F.3d at 759 (citation omitted). But I take issue with several of the facts relied upon by the majority opinion, even when they are viewed as part of a constellation of activity.

The majority credits, in particular, Ms. Reyes's "protectiveness of the vehicle." That refers to the fact that she initially refused to exit her truck to sit in the trooper's car. When she did, she locked the truck "even though an officer was immediately behind it in a marked patrol vehicle." This behavior is taken as evidence of "how nervous [Ms. Reyes] was and how much she wanted to protect whatever was inside." But the majority cites no case law in support of this analysis. And if "[t]he mere fact that a person refuses to consent to search cannot be used as evidence in support of reasonable suspicion," *United States*

13

*v. Machuca-Barrera*, 261 F.3d 425, 435 n.32 (5th Cir. 2001), it seems unlikely that an automatic, instinctual choice to lock one's vehicle upon exiting should be credited. Moreover, in *United States v. Spears*, this court found that an individual's non-compliance with instructions to exit his truck and wait in the patrol car, his evasiveness, and his argumentativeness "did not rise to such a level that it alone created a reasonable suspicion of criminal activity." 636 F. App'x 893, 903 (5th Cir. 2016) (unpublished).

The majority also emphasizes that there is video of Ms. Reyes's reaction to the trooper asking whether she had drugs in the car, "which shows her smile turn quickly into a concerned daze." The Supreme Court has confirmed that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (citations omitted). But a citizen having a visible reaction to being accused of illegal activity by a law enforcement officer is a far cry from the type of nervous or evasive behavior usually offered in support of a finding of reasonable suspicion. *See, e.g., id.* (analyzing "headlong flight" as "the consummate act of evasion"); *United States v. Pack,* 612 F.3d 341, 345, 358–62 (2010) (listing, as evidence of extreme nervousness, the fact that the detained individual was "breathing heavily, his hands were shaking, and his carotid artery was visibly pulsing").

Finally, the majority lists the fact that Ms. Reyes was unemployed among the facts giving rise to the trooper's alleged reasonable suspicion. It credits the officer's explanation that he "figured [her unemployed status] provided her a motive to participate in illegal activity." The majority cites no case law suggesting that we should give Ms. Reyes's employment status analytic weight, and I am deeply concerned about the precedent we set by doing so.

If the grounds above are discounted, the majority opinion rests on the following facts: (1) the trooper knew that the interstate on which Ms. Reyes

was pulled over is a known drug-trafficking corridor; (2) Ms. Reyes drove a truck registered in someone else's name with a temporary plate from a different state; (3) Ms. Reyes offered inconsistent and implausible stories about the purpose of her travel; and (4) Ms. Reyes had a conviction for possession of meth. Contrast these with the grounds credited by this court in *Cavitt*, where we determined that the following facts did not create reasonable suspicion to extend a traffic stop: the defendant's presence on a highway known as a drug route, heavy drug traffic at that time of year, the driver's departure from and return to a "heavy drug trafficking area," the implausibility of his story that he rented a minivan for a quick trip from Illinois to Texas to see his daughter, the lack of a strong resemblance between the driver and the photo on his driver's license, the presence of a radar detector on his dashboard, and the presence of several shopping bags in the vehicle. *United States v. Cavitt*, 550 F.3d 430, 438 (2008).

"Reasonable suspicion must be based on more than the officer's hunches and doubts about [a driver's] story." *Id.* (citation omitted). I respectfully dissent.